FILED

2008 JUL 30 P 3: 22

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

**United States District Court
Eastern District of Virginia
Richmond Division**

| | | |
|---|---|---|
| **The Real Truth About Obama, Inc.** | | |
| | *Plaintiff,* | Case No. 3:08CV483 |
| *v.* | | |
| **Federal Election Commission** and **United States Department of Justice,** | | |
| | *Defendants.* | |

## Verified Complaint for Declaratory and Injunctive Relief

The Real Truth About Obama, Inc. ("RTAO") complains as follows:

### INTRODUCTION

1. This is a pre-enforcement, as-applied and facial challenge to three Federal Election Commission ("FEC") regulations and an FEC enforcement policy that restrict RTAO's constitutionally-protected "issue advocacy," also known as "political speech." *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652, 2659 (2007) ("*WRTL II*"). "Issue advocacy conveys information and educates. An issue ad's impact on an election, if it exists at all, will come only after the voters hear the information and choose —uninvited by the ad—to factor it into their voting decisions." *Id.* at 2667. RTAO will not make any "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office" under *Buckley v. Valeo*, 424 U.S. 1, 44 (1976), nor will any of its activities be coordinated with any candidate. RTAO, therefore, is an issue-advocacy "527" organization, not an organization properly subject to the "political committee" ("PAC") requirements in the Federal Election Campaign Act ("FECA"), as amended by the Bipartisan Campaign Reform Act ("BCRA"). Furthermore, its communications

**Verified Complaint**                    1

are not properly subject to the corporate prohibitions imposed on "independent expenditures" and "electioneering communications" under FECA.

2. RTAO seeks a judgment from this Court (a) declaring that 11 C.F.R. §§ 100.22(b) ("expressly advocating" definition), 100.57 ("contribution" solicitation provision), and 114.15 (*WRTL II* appeal-to-vote test), as well as the FEC's enforcement policy regulating determination of PAC status, including interpreting and applying the Supreme Court's major-purpose, *see Buckley v. Valeo*, 424 U.S. 1, 79 (1976), are unconstitutionally overbroad, void for vagueness, and contrary to law, as they violate the First and Fifth Amendments of the Constitution of the United States and exceed the FEC's statutory authority under FECA, 2 U.S.C. § 431 et seq.; (b) declaring the regulations and the enforcement policy void and setting them aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; and (c) preliminarily and permanently enjoining the FEC and DOJ from enforcing FECA based on the regulations and policy, both facially and as applied, to RTAO and to its intended activities set out herein.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 as a case arising under the First and Fifth Amendments, FECA, the judicial review provisions of the APA, 5 U.S.C. §§ 702-06, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(3), because Defendants are entities of the United States and RTAO resides in this district, in Richmond.

## PARTIES

5. Plaintiff RTAO is a nonstock, nonprofit, Virginia corporation, with its principal place of business in Richmond, Virginia.

6. Defendant FEC is the federal government agency with enforcement authority over FECA.

Its headquarters are located in Washington, District of Columbia. Purporting to act pursuant to its statutory responsibility, the FEC promulgated the regulations and adopted the enforcement policy at issue in this case.

7. Defendant DOJ is an executive department of the government of the United States, with the Attorney General as its head. It's headquarters are in Washington, District of Columbia. It has control over all criminal prosecutions and civil suits in which the United States has an interest, including criminal enforcement authority over the applicable federal laws at issue in this case.

## FACTS

8. RTAO was incorporated in July 2008.

9. It is nonprofit under 26 U.S.C. § 527, which means that it is classified under the Internal Revenue Code as a "political organization" that may receive donations and make disbursements for certain identified political purposes without having to pay corporate income taxes.

10. It is not a "political committee" ("PAC") under FECA because none of its communications will qualify as either a "contribution" or "expenditure," aggregating more than $1,000 during a calendar year, which is a trigger requirement for PAC status under 2 U.S.C. § 431. *See also* 11 C.F.R. § 100.5 (PAC definition).

11. It is also not a PAC because, even if it reaches the $1,000 contribution/expenditure threshold to trigger statutory PAC status under FECA, RTAO does not meet the constitutionally required "major purpose" test, *i.e.*, it is not controlled by a candidate and its "major purpose" is not the nomination or election of any candidate for federal office. *See Buckley v. Valeo*, 424 U.S. 1, 79 (1976) (limiting the imposition of PAC burdens to "organizations that are under the control of a candidate or *the major purpose* of which is the nomination or election of a candidate" because "[t]hey are, by definition, *campaign related*" (emphasis added)); *FEC v. Massachusetts*

*Citizens for Life*, 479 U.S. 238, 253 (1986) ("*MCFL*"); and *North Carolina Right to Life v.*

*Leake*, 525 F.3d 274, 287 (4th Cir. 2008) ("*Leake*") (test is "*the* major purpose," not "*a* major pur-

pose," and determination is made on "whether an organization primarily engages in regulable,

election-related speech").

12. As set out in its Articles of Incorporation, RTAO's purposes are as follows:

> The specific and primary purposes for which this corporation is formed and for which
> it shall be exclusively administered and operated are to receive, administer and expend
> funds in connection with the following:
>
> 1. To provide accurate and truthful information about the public policy positions
> of Senator Barack Obama;
>
> 2. To engage in non-partisan voter education, registration and get out the voter
> activities in conjunction with federal elections;
>
> 3. To engage in any activities related to federal elections that are authorized by
> and are consistent with Section 527 of the Internal Revenue Code except that the
> corporation shall not:
>
> (a) expressly advocate the election or defeat of any clearly identified candidate
> for public office, or
>
> (b) make any contribution to any candidate for public office; and
>
> 4. To engage in any and all lawful activities incidental to the foregoing purposes
> except as restricted herein.

13. However, RTAO has a reasonable belief that it will be deemed a PAC by the FEC and

DOJ because of (a) the FEC's recent use of two of the challenged provisions (§§ 100.22(b) and

100.57) and the FEC's enforcement policy concerning PAC status, *see* FEC, "Political Commit-

tee Status," 72 Fed. Reg. 5595 (Feb. 7, 2007) ("*PAC Status 2*") (emphasizing the need for "flexi-

bility" in determining PAC status based on a wide range of factors in a case-by-case analysis of

"major purpose"), to deem several 527 organizations to be PACs and in violation of FECA, *see*

*id.* at 5605 (listing Matters Under Review ("MURs") in which this occurred); and (b) the similar

nature of RTAO and its planned activities to some of those in the MURs cited in *PAC Status 2.*

14. As to RTAO's planned activities, its Articles forbid it from making express advocacy

communications and contributions to candidates, *see infra*, and, as a corporation, it is forbidden from making "independent expenditures," 2 U.S.C. § 431(17) ("independent expenditure" definition), by 2 U.S.C. § 441b(a) (prohibition on corporate "contribution[s] or expenditure[s] in connection with any election"), as limited to expenditures for express advocacy by *MCFL*. 479 U.S. at 249. This prohibition on corporate express advocacy communications extends to a corporation's website and emails. *See* FEC, "Internet Communications," 71 Fed. Reg. 18589 (Apr. 12, 2006); 11 C.F.R. § 114.4 ("Disbursements for communications beyond the restricted class in connection with a Federal election.").

15. One of the ways that RTAO intends to provide accurate and truthful information about the public policy positions of Senator Obama is by creating a website at www.therealtruthaboutobama.com, where accurate statements about his public policy positions will be stated and documented. *See* Exhibit A.

16. RTAO intends to produce an audio ad entitled *"Change"* and place it on its website, which states the following:

> (Woman's voice) Just what is the real truth about Democrat Barack Obama's position on abortion?
>
> (Obama-like voice) Change. Here is how I would like to change America . . . about abortion:
> - Make taxpayers pay for all 1.2 million abortions performed in America each year
> - Make sure that minor girls' abortions are kept secret from their parents
> - Make partial-birth abortion legal
> - Give Planned Parenthood lots more money to support abortion
> - Change current federal and state laws so that babies who survive abortions will die soon after they are born
> - Appoint more liberal Justices on the U.S. Supreme Court.
>
> One thing I would *not* change about America is abortion on demand, for any reason, at any time during pregnancy, as many times as a woman wants one.
>
> (Woman's voice). Now you know the real truth about Obama's position on abortion. Is this the change that you can believe in?

To learn more real truth about Obama, visit www.The RealTruthAboutObama.com. Paid for by The Real Truth About Obama.

17. RTAO also intends to broadcast *Change* as a radio advertisement on the Rush Limbaugh and Sean Hannity radio programs in heartland states during "electioneering communication" blackout periods thirty days before the Democratic National Convention (July 29-Aug. 28, 2008) and sixty days before the general election (Sep. 5-Nov. 4, 2008), so *Change* will meet the electioneering communication definition at 2 U.S.C. § 434(f)(3).

18. RTAO also intends to create on its website digital postcards setting out Senator Obama's public policy positions on abortion, and viewers will be able to send these postcards to friends from within the website. One of the planned postcards will be similar to the *Change* ad, except it will be done in first person and "signed" by "Barack Obamabortion." The postcards will be designed to be the sort of catchy, edgy, entertaining items that are popular for circulation on the Internet. *See* Exhibit A.

19. In order to raise money for funding its website and content, the production of the *Change* ad, the employment of persons knowledgeable about Internet viral marketing, and the broadcasting of *Change*, RTAO will need to raise funds by telling potential donors about itself and its projects. One of the ways that RTAO intends to raise funds is by use of the following fundraising communication:

> Dear x,
>
> I need your help. We're launching a new project to let the public know the real truth about the public policy positions of Senator Barack Obama.
>
> Most people are unaware of his radical pro-abortion views. For example, when he was a state senator in Illinois, he voted against a state bill like the federal Born Alive Infant Protection Act. That bill merely required that, if an abortionist was trying to abort a baby and the baby was born alive, then the abortionist would have to treat that baby as any other newborn would be treated. Under this law, the baby would be bundled off to the newborn nursery for care, instead of being left on a cold table in a back room until dead. It seems like everyone would support such a law, but, as an Illinois

State Senator, Obama did not. There are lots of other examples of his radical support for abortion, and we need to get the word out. That's where you come in.

A new organization has just been formed to spearhead this important public-information effort. It's called The Real Truth About Obama. We plan to do some advertising. Since we're not a PAC, there won't be any "vote for" or "vote against" type of ads—just the truth, compellingly told.

A central planned project is directed at the world of the Internet. We've already reserved www.TheRealTruthAboutObama.com to set up a website. Here's the exciting part. The website will feature a weekly postcard "signed" by "Barack Obamabortion." Like that? While you are visiting the website, you can send the postcard by email to anyone you designate. What could be easier?! And the postcards will be done in a catchy, memorable manner—the sort of thing that zips around the Internet. Each postcard will feature well-documented facts about Obama's views on abortion.

The postcards will also send people to the website for more real truth about Obama, but we also plan to do a radio ad to do that, too. This radio ad will give the real truth about Obama's abortion position—all properly documented, of course. Notice the "Truth" part of our name.

Of course it takes money to develop, host, and maintain a hot-topic website, and to hire the people who specialize in getting things noticed on the Internet (it's called viral marketing). So we need your help. We need for you to send us money. As much as you can donate. Right away. We need to get the word out. We know how. We're ready to roll. Now we need you.

Your friend for truth,

x

P.S.—Please send your check today. Time is of the essence. Please send the largest gift you can invest in this vital project. Together we can get the word out.

20. RTAO intends to raise more than $1,000 with this fundraising communication and to disburse more than $1,000 both to broadcast *Change* and to place it before the public on RTAO's website.

21. However, RTAO is chilled from proceeding with these activities because it reasonably believes that it will be subject to an FEC and DOJ investigation and a possible enforcement action potentially resulting in civil and criminal penalties, based on the fact that the FEC has deemed 527s to be PACs, based on (a) a rule defining "express advocacy" in a vague and overbroad manner, 11 C.F.R. § 100.22(b) (broad, contextual express-advocacy test), that may

make *Change* an "independent expenditure;" **(b)** a vague and overbroad rule deeming donations to be "contributions" if made pursuant to a solicitation for activity to "support or oppose" a candidate, § 100.57; and **(c)** a vague and overbroad approach to determining whether an organization meets *Buckley*'s major-purpose test for imposing PAC status. *See* FEC, "Political Committee Status . . . ," 69 Fed. Reg. 68056 (Nov. 23, 2004) ("*PAC Status 1*"); *PAC Status 2*, 72 Fed. Reg. 5595.

22. RTAO is also chilled from proceeding because, if Defendants subsequently deem RTAO to have been a PAC while doing its intended activities, then RTAO would have been required to use "federal funds" (funds raised subject to federal source and amount restrictions) to send out the fundraising communication, *see* FEC Advisory Opinion 2005-13 at 1 (Emily's List), and RTAO would be in violation for not having used federal funds for the fundraising communication.

23. RTAO's chill is heightened by the DOJ's recent declaration that investigations and criminal prosecutions of "knowing and willful" violations of these FECA provisions by 527 corporations was a priority, *see* Letter from John C. Keeney, Deputy Assistant Attorney General, to Fred Wertheimer, President, Democracy 21 (June 26, 2008), Exhibit B, which was in response to a Democracy 21 letter to the Attorney General encouraging such enforcement in light of the FEC's own enforcement actions against 527 groups based on these same challenged provisions. *See* Letter from Fred Wertheimer, President, Democracy 21, to Michael Mukasey, Attorney General (May 22, 2008). Exhibit C.

24. Consequently, RTAO reasonably fears, if it proceeds with its intended activities: **(a)** that *Change* (both on RTAO's website and as broadcast) will be deemed express advocacy under 11 C.F.R. § 100.22(b) and, if RTAO is not deemed a PAC, it will be in violation of FECA for mak-

ing a forbidden corporate independent expenditure, failing to place a disclaimer on it, and failing to file an independent expenditure report; **(b)** that, if RTAO is deemed to be a PAC, under the FEC's enforcement policy on "political committees" and because either the publication of *Change* will be considered an "expenditure" (as a result of § 100.22(b)) or the fundraising communication will be considered a "contribution" (as a result of § 100.57), RTAO will be in violation of FECA for failure to abide by numerous PAC requirements, including placing disclaimers on *Change* and RTAO's website, failure to register and report as a PAC, failure to use federal funds for fundraising, failure to abide by limits on contributions to PACs, and failure to abide by the source limitations imposed on PACs; and **(c)** in any event, that RTAO will suffer an intrusive and burdensome investigation and, possibly, an enforcement action, potentially leading to civil and criminal penalties. So RTAO will not proceed with its intended activities unless it receives the judicial relief requested herein.

25. RTAO also reasonably fears, if it proceeds to broadcast *Change*, that it will have broadcast a prohibited electioneering communication because the FEC's rule at 11 C.F.R. § 114.15, creating an exception to the corporate prohibition on electioneering communications, 2 U.S.C. § 441b, is vague and overbroad and RTAO cannot be sure that *Change* is a protected communication under the FEC's rule, although it believes that it is protected under *WRTL II*'s appeal-to-vote test. 127 S. Ct. at 2667 (an ad may be prohibited as an electioneering communication only if it both meets the statutory definition and "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate"). In fact, it is impossible to tell whether the FEC might deem *Change* to be a prohibited electioneering communication, under 11 C.F.R. § 114.15, or a prohibited express-advocacy independent expenditure, under 11 C.F.R. § 100.22(b), when *Change* is run during blackout periods, because the regulatory tests are similar

and similarly vague. So RTAO will not proceed with its plan to broadcast *Change* during electioneering communication blackout periods unless it receives the judicial relief requested herein.

26. RTAO's chill is irreparable harm because it is the loss of First Amendment rights. There is no adequate remedy at law.

## Count 1
## 11 C.F.R. § 100.22(b)—"Expressly Advocating"

27. RTAO realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

28. The FEC's secondary definition of "expressly advocating," at 11 C.F.R. § 100.22(b), is as follows:

> **Sec. 100.22 Expressly advocating (2 U.S.C. 431(17)).**
> Expressly advocating means any communication that . . . (b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—
> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and
> (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

29. This regulation is unconstitutionally vague and overbroad in violation of the First and Fifth Amendments to the U.S. Constitution and has been held unconstitutional by this Court, *Virginia Society for Human Life v. FEC*, 83 F. Supp. 2d 668 (E.D. Va. 2000), which was affirmed in relevant part by *Virginia Society for Human Life v. FEC*, 263 F.3d 379 (4th Cir. 2001).

30. The Supreme Court has held that the prohibition on corporate independent expenditures at 2 U.S.C. § 441b is unconstitutional unless the expenditures are for "express advocacy" communications, *MCFL*, 479 U.S. at 249, which requirement has been incorporated by Congress into the "independent expenditure" definition. 2 U.S.C. § 431(17) ("expressly advocating").

**Verified Complaint** 10

31. Both *McConnell v. FEC*, 540 U.S. 93, 193 (2003), and *WRTL II*, 127 S. Ct. at 2669 n.7, have subsequently affirmed that "express advocacy" requires so-called "magic words," such as "vote for" or "defeat." *See Buckley*, 424 U.S. at 44 n.52 ("communications containing express words of advocacy of election or defeat, such as . . ."). Despite these rulings, the FEC still insists that it may enforce its alternate definition of express advocacy contained in § 100.22(b). *PAC Status 2,* 72 Fed. Reg. at 5604 (The FEC "was able to apply the alternative test set forth in 11 CFR 100.22(b) free of constitutional doubt based on *McConnell*'s statement that a 'magic words' test was not constitutionally required . . . .").

32. After *McConnell*, however, the Fourth Circuit reaffirmed that express advocacy still requires the magic words, *Leake*, 525 F.3d at 281-82, and that, under the unambiguously-campaign-related requirement, the government may only regulate express advocacy properly defined as limited to magic words:

> Pursuant to their power to regulate elections, legislatures may establish campaign finance laws, so long as those laws are addressed to communications that are unambiguously campaign related. The Supreme Court has identified two categories of communication as being unambiguously campaign related. First, "express advocacy," defined as a communication that uses specific election-related words.

*Leake*, 525 F.3d at 282-83. Thus, because *Buckley's* and *MCFL's* express-advocacy test is an authoritative construction on the definition of "expenditure" and "independent expenditure" in FECA and establishes a constitutional limit on the application of any requirements applied to each, the rule at § 100.22(b) is beyond the FEC's statutory authority.

33. Because the regulation at § 100.22(b) goes beyond any permissible construction of express advocacy, is unconstitutionally vague and overbroad, and is "in excess of the statutory . . . authority . . ." of the FEC, it is void under 5 U.S.C. § 706.

**Count 2**
**11 C.F.R. § 100.57(a)—Donations "To Support or Oppose"**

34. RTAO realleges and incorporates by reference all of the allegations contained in all of
the preceding paragraphs.

35. The FEC's regulation at 11 C.F.R. § 100.57(a) is as follows:

> **Sec. 100.57 Funds received in response to solicitations.**
> (a) Treatment as contributions. A gift, subscription, loan, advance, or deposit of
> money or anything of value made by any person in response to any communication is
> a contribution to the person making the communication if the communication indicates
> that any portion of the funds received will be used to support or oppose the election of
> a clearly identified Federal candidate.

36. This regulation is unconstitutionally vague and overbroad under the First and Fifth

Amendments to the U.S. Constitution, because "support" and "oppose" are undefined, go beyond

express advocacy and are unconstitutionally vague. They give inadequate notice to enforcers and

the regulated community of what these words encompass and so chill protected "issue advo-

cacy," or "political speech." *See Leake*, 525 F.3d at 280, 285 (holding statute regulating speech

"to support or oppose the nomination or election of one or more clearly identified candidates" to

be "unconstitutionally overbroad and vague"). *See also North Carolina Right to Life v. Bartlett*,

168 F.3d 705 (4th Cir. 1999) (striking down a law containing a support/oppose test and other

flaws as unconstitutionally vague and overbroad), *cert. denied*, 528 U.S. 1153 (2000); *Cole v.*

*Richardson*, 405 U.S. 676, 678-85 (1972) (Court treated required oaths to support one's country

and "oppose" its enemies as harmless "amenities" merely requiring compliance with other laws,

but explained that "oppose" would be vague in other contexts); *Cramp v. Board of Public In-*

*struction*, 368 U.S. 278, 279 (1971) (held "support" unconstitutionally vague); *Center for Indi-*

*vidual Freedom v. Carmouche*, 449 F.3d 655, 662-65 (5th Cir. 2006) ("*CFIF*") (imposing

express-advocacy construction to save law requiring reporting and disclosure of payments "for

the purpose of supporting, opposing, or otherwise influencing the nomination or election of a person" from overbreadth and vagueness); *American Civil Liberties Union of Nevada v. Heller*, 378 F.3d 979, 985 (9th Cir. 2004) ("*McConnell*[, 540 U.S. 93,] 'left intact the ability of courts to make distinctions between express advocacy and issue advocacy, where such distinctions are necessary to cure vagueness and over-breadth in statutes which regulate more speech than that for which the legislature has established a significant governmental interest.' *Anderson v. Spear*, 356 F.3d 651, 664-65 (6th Cir. 2004)."); *Anderson v. Spear*, 356 F.3d 651, 663 (6th Cir. 2004) (imposing express-advocacy construction on "electioneering" definition that targeted "solicitation of votes for or against any candidate or question on the ballot in any manner" to save it from overbreadth and vagueness).

37. In addition, *Buckley* construed the definition of "contribution," 2 U.S.C. § 431(8) ("anything of value made by any person  for the purpose of influencing any election for Federal office")—in a manner consistent with the unambiguously-campaign-related requirement—to encompass only "funds provided to a candidate or political party or campaign committee." 424 U.S. at 23 n.24.

38. The FEC regulation construes "contribution," however, to include donations that are not "funds provided to a candidate or political party or campaign committee." *Id.* Because *Buckley* has authoritatively construed the definition of "contribution" and established a constitutional limit on its application, the FEC regulation at 11 C.F.R. § 100.57 is beyond the FEC's statutory authority.

39. Because the regulation at § 100.57 goes beyond any permissible construction of contribution, it is unconstitutionally vague and overboad, and is "in excess of the statutory . . . authority . . ." of the FEC, it is void under 5 U.S.C. § 706.

## Count 3
## "The Major Purpose" PAC Test

40. RTAO realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

41. The FEC's enforcement policy regarding PAC status is set out in two FEC policy statements: *PAC Status 1*, 69 Fed. Reg. 68056, and *PAC Status 2*, 72 Fed. Reg. 5595. *PAC Status 2* cited 11 C.F.R. §§ 100.22(b) and 100.57 as central components of its enforcement policy, 72 Fed. Reg. at 5602-05, and, as a result, any flaws in those regulations are also fatal to the FEC's PAC status enforcement policy.

42. The major-purpose test is the third element of the FEC's PAC status enforcement policy. In *PAC Status 2*, the FEC explained that, after having initiated a rulemaking proceeding, it declined to adopt a rule for the major-purpose test, declaring that "the major purpose doctrine . . . requires the flexibility of a case-by-case analysis of an organization's conduct." *Id.* at 5601. Instead, it set out its vague and overbroad enforcement policy regulating major purpose, requiring the FEC to engage in "a fact intensive inquiry," in order to weigh various vague and overbroad factors with undisclosed weight, requiring "investigations into the conduct of specific organizations that may reach well beyond publicly available statements," including all an organization's "spending on Federal campaign activity" (but not limited to spending on regulable activity) and other spending, and public and non-public statements, including statements to potential donors. *Id.*

43. *PAC Status 2* identified the "major purpose" at issue in its major-purpose test as being "*Federal campaign activity*," *id.* at 5605 (emphasis added), not the narrower "*nomination or election of a candidate*," which *Buckley* required as "the major purpose." 424 U.S. at 79 (empha-

sis added). While *MCFL* used "campaign *advocacy*," 479 U.S. at 252 (plurality opinion) (emphasis added), to "further the *election* of candidates," *id.* at 253 (plurality opinion) (emphasis added), and "campaign activity," *id.* at 262 (majority opinion), when speaking of the purpose at issue in the major-purpose test, it did so solely as synonyms for *Buckley*'s "nomination or election" requirement, which it cited and quoted. *MCFL*, 479 U.S. at 252 n.6 (citing *Buckley*, 424 U.S. at 79). There is no authority for the FEC's reformulation of the major-purpose test to focus on "Federal campaign *activity*."

44. *PAC Status 2* also indicated that the FEC would consider other factors in its ad hoc, totality-of-the-circumstances, major-purpose test when it discussed its application of the policy to some 527 organizations in previous investigations. 72 Fed. Reg. at 5603-04. These included the fact that an entity spent much of its money "on advertisements directed to Presidential *battle-ground States* and direct mail *attacking* or expressly advocating," *id.* at 5605 (emphasis added), the fact that groups ceased activity after an election, *id.*, and the fact that they didn't make disbursements in state and local races. *Id.* In addition, the FEC thought that it could determine a 527 groups major purpose from internal planning documents and budgets, *id.*, which would normally be protected by First Amendment privacy concerns and were only obtained because the organization was subjected to a burdensome, intrusive investigation. Major purpose was even based on a private thank-you letter to a donor, after the donation had already been made. *Id.*

45. *PAC Status 2*, therefore, sets out an enforcement policy based on an ad hoc, case-by-case, analysis of vague and impermissible factors applied to undefined facts derived through broad-ranging, intrusive, and burdensome investigations, often begun when a complaint is filed by a political or ideological rival, that, in themselves, can shut down an organization, without adequate bright lines to protect issue advocacy in this core First Amendment area.

46. Under the major-purpose test set out in *Buckley*, 424 U.S. at 79, however, PAC status may be determined by either an entity's expenditures, *MCFL*, 479 U.S. at U.S. at 262 (major purpose calculation looks at express-advocacy independent expenditures in relation to total expenditures: "should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee"); *Leake*, 525 F.3d at 287 ("an empirical judgment as to whether an organization primarily engages in regulable, election-related speech"), or by the organization's central purpose revealed in its organic documents. *MCFL*, 249 U.S. at 252 n.6 ("[O]n this record . . . MCFL['s] . . . central organizational purpose is issue advocacy."). Thus, the first test for major purpose requires a comparison of the entity's total disbursements for a year with its unambiguously campaign related and regulable expenditures, so that only the amount of true political "contributions" and "expenditures" would be counted. The second test requires an examination of the entity's organic documents to determine if there was an express intention to operate as a political committee, *e.g.*, by being designated as a "separate segregated fund" (an internal "PAC") under 2 U.S.C. § 441b(2)(c). Because *Buckley's* and *MCFL's* major-purpose test is an authoritative construction of the definition of "political committee," and a constitutional limit on the application of the political committee requirements of FECA, the FEC's enforcement policy that does not comply with this construction is beyond the FEC's statutory authority.

47. Because the FEC's enforcement policy for determination of PAC status goes beyond any permissible construction of the major-purpose test, employs invalid regulations to determine whether the entity received a "contribution" or made an "expenditure," is unconstitutionally vague and overboad, and is "in excess of the statutory . . . authority . . ." of the FEC, it is void under 5 U.S.C. § 706.

## Count 4
## 11 C.F.R. § 114.15—*WRTL II's* Appeal-to-Vote Test

48. RTAO realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

49. The FEC's rule, 11 C.F.R. § 114.15, purporting to implement *WRTL II's* appeal-to-vote test, is as follows:

> **§ 114.15 Permissible use of corporate and labor organization funds for certain electioneering communications.**
>
> (a) *Permissible electioneering communications.* Corporations and labor organizations may make an electioneering communication, as defined in 11 CFR 100.29, to those outside the restricted class unless the communication is susceptible of no reasonable interpretation other than as an appeal to vote for or against a clearly identified Federal candidate.
>
> (b) *Safe harbor.* An electioneering communication is permissible under paragraph (a) of this section if it:
>
> (1) Does not mention any election, candidacy, political party, opposing candidate, or voting by the general public;
>
> (2) Does not take a position on any candidate's or officeholder's character, qualifications, or fitness for office; and
>
> (3) Either:
>
> (i) Focuses on a legislative, executive or judicial matter or issue; and
>
> (A) Urges a candidate to take a particular position or action with respect to the matter or issue, or
>
> (B) Urges the public to adopt a particular position and to contact the candidate with respect to the matter or issue; or
>
> (ii) Proposes a commercial transaction, such as purchase of a book, video, or other product or service, or such as attendance (for a fee) at a film exhibition or other event.
>
> (c) *Rules of interpretation.* If an electioneering communication does not qualify for the safe harbor in paragraph (b) of this section, the Commission will consider whether the communication includes any indicia of express advocacy and whether the communication has an interpretation other than as an appeal to vote for or against a clearly identified Federal candidate in order to determine whether, on balance, the communication is susceptible of no reasonable interpretation other than as an appeal to vote for or against a clearly identified Federal candidate.
>
> (1) A communication includes indicia of express advocacy if it:
>
> (i) Mentions any election, candidacy, political party, opposing candidate, or voting by the general public; or
>
> (ii) Takes a position on any candidate's or officeholder's character, qualifications, or fitness for office.
>
> (2) Content that would support a determination that a communication has an

interpretation other than as an appeal to vote for or against a clearly identified Federal
candidate includes content that:

(i) Focuses on a public policy issue and either urges a candidate to take a position
on the issue or urges the public to contact the candidate about the issue; or

(ii) Proposes a commercial transaction, such as purchase of a book, video or other
product or service, or such as attendance (for a fee) at a film exhibition or other event;
or

(iii) Includes a call to action or other appeal that interpreted in conjunction with
the rest of the communication urges an action other than voting for or against or con-
tributing to a clearly identified Federal candidate or political party.

(3) In interpreting a communication under paragraph (a) of this section, any doubt
will be resolved in favor of permitting the communication.

(d) *Information permissibly considered.* In evaluating an electioneering communi-
cation under this section, the Commission may consider only the communication itself
and basic background information that may be necessary to put the communication in
context and which can be established with minimal, if any, discovery. Such informa-
tion may include, for example, whether a named individual is a candidate for office or
whether a communication describes a public policy issue.

50. This regulation is unconstitutionally vague and overbroad under the First and Fifth

Amendments to the U.S. Constitution because, in 11 C.F.R. § 114.15(c), the FEC requires that,

for a communication to be exempt from the corporate prohibition on electioneering communica-

tions, the communication must pass *both WRTL II* appeal-to-vote test, 127 S. Ct. at 2667, *i.e.*,

"whether the communication has an interpretation other than as an appeal to vote for or against a

clearly identified Federal candidate," 11 C.F.R. § 114.15(c), and the FEC's indicia-of-express-

advocacy test, *i.e.*, "whether the communication includes any indicia of express advocacy." *Id.*

Adding the "indicia-of-express-advocacy" test to *WRTL II*'s appeal-to-vote test unconstitution-

ally narrows *WRTL II*'s protection of issue advocacy and is unconstitutionally vague and

overbroad.

51. The Fourth Circuit has recent affirmed that the government may only regulate election-

eering communications that are limited by *WRTL II*'s appeal-to-vote test:

Pursuant to their power to regulate elections, legislatures may establish campaign
finance laws, so long as those laws are addressed to communications that are unambig-

uously campaign related. The Supreme Court has identified two categories of communication as being unambiguously campaign related.... Second, "the functional equivalent of express advocacy," defined as an "electioneering communication" that "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."

*Leake*, 525 F.3d at 282-83.

52. *WRTL II* limited the scope of the statutory "electioneering communications" prohibited by 2 U.S.C. § 441b, but 11 C.F.R. § 114.15 rejects this limitation. Because *WRTL II*'s appeal-to-vote test is an authoritative construction to the extent of the corporate prohibition on "electioneering communications," and a constitutional limit on the application of the electioneering communication prohibition, the rule is beyond the FEC's statutory authority.

53. Because the regulation at 11 C.F.R. § 114.15 goes beyond any permissible construction of *WRTL II*'s appeal-to-vote test, is unconstitutionally vague and overboad, and is "in excess of the statutory ... authority..." of the FEC, it is void under 5 U.S.C. § 706.

## PRAYER FOR RELIEF

Wherefore, RTAO prays for the following relief:

1. a declaratory judgment declaring (a) 11 C.F.R. § 100.22(b) ("expressly advocating"), (b) 11 C.F.R § 100.57 (donations "to support or oppose"); (c) the FEC's political committee enforcement policy; and (d) 11 C.F.R. § 114.15 (*WRTL II*'s appeal-to-vote test) are void under 5 U.S.C. § 706 and are, therefore, set aside;

2. a preliminary and permanent injunction enjoining the FEC and DOJ from enforcing these rules and enforcement policy facially and as applied to RTAO, to its intended activities, and to all other entities similarly situated;

3. costs and attorneys fees pursuant to any applicable statute or authority; and

4. any other relief this Court in its discretion deems just and appropriate.

## VERIFICATION

I, Kevin Allen, declare as follows:

1. I am the Incorporator of RTAO and a member of the Board of Directors.

2. I have personal knowledge of RTAO and its activities, including those set out in the foregoing *Complaint*, and if called upon to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Complaint* concerning and its planned activity are true and correct. Executed on July 30 , 2008.


_Kevin Allen_
Kevin Allen


**Verified Complaint**

Respectfully submitted,

Michael Boos (VA State Bar No. 37524)
Law Office of Michael Boos
4101 Chain Bridge Road, Suite 313
Fairfax, VA 22030
703/691-7717 telephone
703/691-7543 facsimile
michael.boos@gte.net

James Bopp, Jr.,* jboppjr@aol.com
Richard E. Coleson,* rcoleson@bopplaw.com
Barry A. Bostrom,* bbostrom@bopplaw.com
Clayton J. Callen* ccallen@bopplaw.com
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
812/232-2434 telephone
812/234-3685 facsimile
  *pro hac vice motion pending
*Lead Counsel for Plaintiff*

**Verified Complaint**

## Exhibits

**A**   Obama Abortion Projects Proposal

**B**   Letter from John C. Keeney, Deputy Assistant Attorney General, to Fred Wertheimer, President, Democracy 21 (June 26, 2008)

**C**   Letter from Fred Wertheimer, President, Democracy 21, to Michael Mukasey, Attorney General (May 22, 2008)

**Verified Complaint**