IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

THE REAL TRUTH ABOUT OBAMA, INC.,

                           Plaintiff,

        v.                                    Civil Action Number 3:08-CV-483

FEDERAL ELECTION COMMISSION, *et al.*,

                          Defendants.

<u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on two Motions for Preliminary Injunction (Docket Nos. 3 & 53) filed by Plaintiff, The Real Truth About Obama, Inc. filed July 30, 2008.  For the reasons expressed below, the Court shall DENY the two Motions.

<u>I.  BACKGROUND</u>

<u>A.  Factual Background</u>

Plaintiff, The Real Truth About Obama, Inc. ("RTAO"), is a non-profit, Virginia corporation that was incorporated on July 24, 2008.  (Compl. for Declaratory and Injunctive Relief, ¶¶ 5,8.)  RTAO is a non-profit, organized under 26 U.S.C. § 527, making it a political organization that may receive donations and make disbursements for political purposes.  (Compl. ¶ 9.) Defendants are the Federal Election Commission ("FEC") and the United States Department of Justice ("DOJ").  The FEC is an independent agency of the United States government with exclusive jurisdiction to administer, interpret, and civilly enforce federal election laws.  (FEC Mem. in Opp'n to Pl. Mot. for Prelim. Inj. 1.)  The DOJ

1

has jurisdiction over election laws only to the extent of investigation and prosecution of

persons who "knowingly and willfully commit [ ] a violation" of the Federal Election

Campaign Act ("FECA").  (U.S. DOJ Mem. in Opp'n to Pl. Mot. for Prelim. Inj. 2.)

RTAO intends to produce an audio ad entitled "Change" and place it on its website.

(Compl. ¶ 15.)  The advertisement states the following:

(Woman's voice) Just what is the real truth about Democrat Barack Obama's position on abortion?

(Obama-like voice) Change.  Here is how I would like to change America . . . about abortion:
1. Make taxpayers pay for all 1.2 million abortions performed in American each year
2. Make sure that minor girls' abortions are kept secret from their parents
3. Make partial-birth abortion legal
4. Give Planned Parenthood lots more money to support abortion
5. Change current federal and state laws so that babies who survive abortions will die soon after they are born
6. Appoint more liberal Justices on the U.S. Supreme Court.

One thing I would *not* change about America is abortion on demand, for any reason, at any time during pregnancy, as many times as a woman wants one.

(Woman's voice). Now you know the real truth about Obama's position on abortion.  Is this the change you can believe in?

To learn more real truth about Obama, visit www.TheRealTruthAboutObama.com.  Paid for by The Real Truth About Obama.

(Compl. ¶ 16 .)  RTAO intends to broadcast "Change" on the Rush Limbaugh and Sean

Hannity radio programs sixty days before the general election (September 5 - November 4,

2008).  (Compl. ¶ 17.)  RTAO has produced a second advertisement, which is the subject of

the second Preliminary Injunction Motion, entitled "Survivor." (Pl. Mot. for Second Prelim.

Inj. 1-3.)  The advertisement states:

> (Nurse) The abortion was supposed to kill him, but he was born alive.  I couldn't bear to follow hospital policy and leave him on a cold counter to die, so I held and rocked him for 45 minutes until he took his last breath.

> (Male voice) As an Illinois Democrat State Senator, Barack Obama voted three times to <u>deny</u> lifesaving medical treatment to living, breathing babies who survive abortions.  For four years, Obama has tried to cover-up his horrendous votes by saying the bills didn't have clarifying language he favored.  Obama has been lying.  Illinois documents from the very committee Obama chaired show he voted <u>against</u> the bill that <u>did</u> contain the clarifying language he says he favors.
> Obama's callousness in denying lifesaving treatment to tiny babies who survive abortions reveals a lack of character and compassion that should give everyone pause.

> Paid for by The Real Truth About Obama, Inc.

(Pl. Aff. of Kevin Allen 1.) (emphasis in original).

RTAO also intends to create website-driven digital postcards sending out Senator

Obama's public policy positions on abortion. (Compl. ¶ 18.)  As a way to raise money for

the website and content, RTAO intends to use the following fundraising communication:

> Dear x,
>     I need your help.  We're launching a new project to let the public know the real truth about the public policy positions of Senator Barack Obama.
>     Most people are unaware of his radical pro-abortion views.  For example, when he was a state senator in Illinois, he voted against a state bill like the federal Born Alive Infant Protection Act.  That bill merely required that, if an abortionist was trying to abort a baby and the baby was born alive, then the abortionist would have to treat that baby as any other newborn would be treated.  Under this law, the baby would be bundled off to the newborn nursery for care, instead of being left on a cold table in a backroom until dead.  It seems like everyone would support such a law, but as an Illinois State Senator, Obama did not.  There are lots of other examples of his radical support for abortion, and we need to get the word out.  That's where you come in.

3

A new organization has just been formed to spearhead this important public information effort. It's called The Real Truth About Obama. We plan to do some advertising. Since we're not a PAC, there won't be any "vote for" or "vote against" type of ads—just the truth, compellingly told.

A central planned project is directed at the world of the Internet. We've already reserved www.TheRealTruthAboutObama.com to set up a website. Here's the exciting part. The website will feature a weekly postcard "signed" by "BarackObamabortion." Like that? While you are visiting the website, you can send the postcard by email to anyone you designate. What could be easier?! And the postcards will be done in a catchy, memorable manner—the sort of thing that zips around the Internet. Each postcard will feature well-documented facts about Obama's views on abortion.

The postcards will also send people to the website for more real truth about Obama, but we also plan to do a radio ad to do that too. This radio ad will give the real truth about Obama's abortion position—all properly documented, of course. Notice the "Truth" part of our name.

Of course it takes money to develop, host, and maintain a hot-topic website, and to hire the people who specialize in getting things noticed on the Internet (it's called viral marketing). So we need your help. We need for you to send us money. As much as you can donate. Right away. We need to get the word out. We know how. We're ready to roll. Now we need you.

Your friend for truth,

x

P.S. — Please send your check today. Time is of the essence. Please send the largest gift you can invest in this vital project. Together we can get the word out.

(Compl. ¶ 19.) Lastly, RTAO alleges that it intents to raise more than $1,000 and spend more than $1,000 to broadcast its message, which could trigger FEC regulations. (Compl. ¶ 19.)

B. Procedural Background

RTAO incorporated in July 24, 2008 and shortly thereafter filed these motions. (Def. FEC Mem. 1.)

RTAO has brought a facial and as-applied constitutional challenge to three election law-related regulations, 11 C.F.R. § 100.22, 11 C.F.R. § 100.57, and 11 C.F.R. § 114.15,

4

and the FEC's enforcement policy regulating determination of political action committee

("PAC") status.  (Compl. ¶¶ 1,2.)  RTAO believes that its advertisement, solicitation, and

the activities of the organization will place it within the realm of regulations 11 C.F.R. §

100.22, 11 C.F.R. § 100.57, and will be deemed a political action committee ("PAC") by

the FEC.  (Compl. ¶ 21.)  Because of these regulations, Plaintiff asserts that its rights have

been chilled because of the unconstitutionality of the provisions.  Further, Plaintiff alleges

that because the FEC definition of "express advocacy" is overbroad, it will be restricted by

11 C.F.R. § 114.15, which is also unconstitutional.

For these reasons, Plaintiff asserts that the regulations and enforcement policy are

void and should be set aside under the Administrative Process Act ("APA").  (Compl.¶¶ 1,

2.)  Plaintiff asks for a preliminary and permanent injunction "enjoining the FEC and DOJ

from enforcing FECA based on the regulations and policy . . . . to RTAO and to its intended

activities," (Compl.¶ 2) but also to "all other entities similarly situated." (Compl. 19, Pl.

Prayer for Relief  ¶2.)

## II.  PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is "an extraordinary remedy," one "to be granted only

sparingly."  In re Microsoft Litig., 333 F.3d 517, 524 (4th Cir. 2003); accord Microstrategy

Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001).  It "maintains a particular

relationship between the parties" to a case before it is decided on its merits.  United States

Dept. of Labor v. Wolf Run Mining Co., 452 F.3d 275, 280 (4th Cir. 2006).  Accordingly,

whether a preliminary injunction is warranted depends on the relative effect on the parties

of maintaining the status quo, as well as the public interest in doing so.  Id.  And, a preliminary injunction may not grant relief of a character that could not ultimately be granted.  In re Microsoft Litig., 333 F.3d at 525.

A court deciding whether to issue a preliminary injunction must weigh four factors: (1) the likelihood of irreparable harm to the plaintiff if its request for relief is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits of its claim; and (4) the public interest.  Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 193 (4th Cir. 1977); accord Wolf Run Mining Co., 452 F.3d at 280.

The United States Supreme Court has not specified the order in which a court should analyze these factors, nor the weight that they should be given.  See Globe Nuclear Svcs. & Supply, Ltd. v. AO Techsnabexport, 376 F.3d 282, 287 (4th Cir. 2004).  In some decisions, the Fourth Circuit has declared that the first two factors—the "balancing of harms" test—are the most important.  See, e.g., Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991).  In Blackwelder, the Fourth Circuit declared that a court deciding whether to grant a preliminary injunction must first compare the likelihood of irreparable harm to the plaintiff to the likelihood of harm to the defendant and if "a decided balance of hardship" in the plaintiff's favor results, then a preliminary injunction is warranted if the plaintiff's claims involve serious, difficult questions.  550 F.2d at 195.  As the probability that the plaintiff will suffer irreparable harm decreases, the importance of the third factor—the strength of the plaintiff's case—increases.  Id.  Although the Fourth Circuit

has adopted this approach on several occasions, it recently cautioned that focusing on the "balancing of harms" test is contrary to Supreme Court precedent.  See Scotts Co. v. United Indus. Corp., 315 F.3d 264, 271 n.2 (4th Cir. 2002).[1]

The Fourth Circuit has recently held that, in a case—such as the one before this Court—"when 'the irreparable harm that [the plaintiff] has alleged is inseparably linked to his claim of a violation of his First Amendment rights . . . analysis of [the plaintiff's] likelihood of success on the merits becomes the first and the most important factor for a court to consider." Ctr. for Individual Freedom, Inc. v. Ireland, No. 1:08-190, 2008 WL 1837324, at *2 (S.D.W.Va. Apr. 22, 2008) (quoting Newsom ex rel. Newsom v. Abermarle County Sch. Bd., 354 F.3d 249, 254-55 (4th Cir. 2003).  For that reason, the Court will analyze RTAO's likelihood of success on the merits of the claim before tackling the other preliminary injunction factors.

The party seeking the preliminary injunction bears the burden of proving that each factor supports granting relief.  Direx Israel, 952 F.2d at 812; Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n, Inc., 2007 WL 186537, *4 (W.D.N.C. Jan. 22, 2007); see Granny Goose Foods, Inc., v. Bhd. of Teamsters & Auto. Truck Drivers Local

---

[1]In Scotts, the Fourth Circuit stated "Blackwelder's emphasis on the balancing of the harms rather than the likelihood of success has been criticized, even within this court, as inconsistent with Supreme Court precedent. See Safety-Kleen, Inc. v. Wyche, 274 F. 3d 846, 868 (4th Cir. 2001). . . .  In the course of their challenges to the preliminary injunction, the defendants ask that we 'restate the standards for a preliminary inunction to restore clarity to [our] jurisprudence.'" Scotts, 315 F.3d at 271 n.2.  The Court stated however, that they "cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court.  Only the Supreme Court or this court sitting en banc can do that." Id. (citing Mentavalos v. Anderson, 249 F.3d 301, 312 n.4 (4th Cir. 2001).

No. 70, 415 U.S. 423, 442-43 (1974).

## III.  DISCUSSION

### A.  Brief History of the FECA and BCRA

The history of election and campaign regulatory law was discussed quite aptly in McConnell v. FEC, 251 F. Supp. 2d 176, 188–206 (D.D.C. 2003) and has been reiterated several times since.  The following is a brief history of FECA and the presently-challenged regulations.  FECA was enacted in 1971 in order to reform the nation's federal campaign finance laws.  Part of these reforms included requiring disclosure of certain contributions and disclosure of expenditures by all candidates and political committees who spend more than $1,000 per year.  Pub. L. No. 92-255, 86 Stat. 3; McConnell v. FEC, 540 U.S. 93, 118 (2003).  The law also included the prohibition on the use of corporate and union general treasury funds for contributions and expenditures.  McConnell, 540 U.S. at 118.  Political Action Committees ("PACs") were created to allow for separate election-related contributions and expenditures of corporations and unions.  Id.

FECA was reformed in 1976 by the Federal Election Campaign Act Amendments of 1976, which closed the loopholes left in the original 1972 bill.  See Pub. L. No. 94-283, 90 Stat. 475.  These amendments further limited contributions, required reporting if contributions or expenditures exceeded a certain limit and created the FEC to regulate and enforce the legislation.  Id.  FECA was challenged in the landmark federal campaign finance reform case, Buckley v. Valeo where, among other things, the definition of express

advocacy and the provisions for expenditures and contributions were fine-tuned into the regulations of today.  See 424 U.S. 1, 14-23 (1976).

More loopholes were discovered as FECA became integrated into American electoral politics, and in 2002 Congress passed the Bipartisan Campaign Reform Act of 2002 ("BCRA").  Pub. L. No. 107-155, 116 Stat. 81.  The provisions of BCRA attempt to limit the use of nonfederal funds by political parties and prohibit labor unions and corporate treasury funds from being used to contribute to advertisements with a federal electioneering purpose.  McConnell v. FEC, 251 F. Supp. 176, 205–06 (D.D.C. 2003).

The regulations being challenged here were adopted from the court decisions and statutes adopted by Congress to combat improper electioneering communications.  11 C.F.R. § 100.22 went into effect after the decisions in Buckley,  FEC v. Mass. Citizens for Life, Inc., 479 U.S. 238, 249 (1986) ("MCFL"), and FEC v. Furgatch, 807 F.2d 857 (9th Cir. 1987), enumerated the meaning of "express advocacy."  60 Fed. Reg. 52069 (Oct. 5, 1995).  11 C.F.R. § 100.57 became effective on January 1, 2005, and was enacted to clarify the definition of contribution in the world of campaign finance.  See 69 Fed. Reg. 68,056 (Nov. 23, 2004).  The definition used by the FEC to determine PAC status—the "major purpose" test—has not been officially ratified as a regulation, but has been adopted into a FEC Explanation and Justification Notice put out by the FEC as recently as 2007. See 72 Fed. Reg. 5595 (Feb. 7, 2007).  Finally, 11 C.F.R. § 114.15 was adopted to incorporate the language adopted in FEC v. Wisconsin Right to Life, Inc., 127 S. Ct. 2652 (2007) ("WRTL") to determine electioneering communication funding by corporations or

unions.  72 Fed. Reg. 72,899, 72,902 (Dec. 26 2007).

B.  Jurisdiction/Standing Arguments

Before analyzing the claims asserted under the Preliminary Injunction standard,

Defendant FEC has argued several standing requirements that should be addressed.  The

FEC argues that Plaintiff lacks standing because RTAO's activities will not come under FEC

oversight through the challenged regulations.  The FEC states that Plaintiff's activities will

not fall under sections 100.22(a), (b), 100.57, or 114.15, therefore there is no threat of

litigation, and therefore, no case or controversy.  (Def. FEC Mem. 6.)

1.  Section 100.22

In Defendant FEC's response, the FEC states that Plaintiff's ad, "Change," would

not fall under the express advocacy definition, either (a) or (b)[2], therefore there is no viable

---

[2] The language of the rule states:
Expressly advocating means any communication that--

(a) Uses phrases such as "vote for the President," "re-elect your Congressman," "support the Democratic nominee," "cast your ballot for the Republican challenger for U.S. Senate in Georgia," "Smith for Congress," "Bill McKay in '94," "vote Pro-Life" or "vote Pro-Choice" accompanied by a listing of clearly identified candidates described as Pro-Life or Pro-Choice, "vote against Old Hickory," "defeat" accompanied by a picture of one or more candidate(s), "reject the incumbent," or communications of campaign slogan(s) or individual word(s) which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s), such as posters, bumper stickers, advertisements, etc. which say "Nixon's the One," "Carter '76," "Reagan/Bush," or "Mondale!"; or

(b) When taken as a whole and with limited reference to external events, such as proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified

threat of litigation.  (Def. FEC Mem. 6.)  The FEC asserts that "[r]easonable minds could . . . . differ as to whether [the ad] encourages actions to . . . defeat" Senator Obama, therefore the FEC argues that the fact that reasonable minds could differ places the advertisement outside the scope of section 100.22, therefore making this an unripe controversy.  (Def. FEC Mem. 12.)  Defendant FEC admits, however, that RTAO's "Survivor" ad is unquestionably express advocacy.  (Def. Mem. in Opp'n to Second Prelim. Inj. 1.)  Because these claims are pro-active, not retroactive, FEC concludes that the overbreadth challenge to these regulations is invalid because "a party asserting overbreadth standing must still demonstrate a 'distinct and palpable injury.'" Peterson v. Nat'l Telecomm. & Info. Admin., 478 F.2d 626, 634 (4th Cir. 2007).

The Supreme Court has held that to satisfy the constitutional standing requirements for an as-applied challenge, "a plaintiff must establish that he or she has (1) suffered an injury in fact, which is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) which is fairly traceable to the challenged act, and (3) is likely to be redressed by a favorable decision." EMILY's List v. FEC, No. 05-0049, 2008 WL 2938558, at *12 (D.D.C. July 31, 2008) (citing Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1427 (D.C.Cir. 1996).  In EMILY's List, Plaintiff's assertion was that it was

---

candidate(s) because --
> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and
> (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action."

11 C.F.R. § 100.22 (1995).

"unable, without risking enforcement action by the FEC, to conduct its nonfederal activities without complying with draconian federal financing rules." Id. at *15.  The FEC, in that case, challenged standing because, it asserted, Plaintiff was not prohibited "from engaging in electoral speech" and it "had not been required to alter its practices as a result of the new 50% federal funds" requirements. Id. at *12. The Court found that standing was proper because Plaintiff "*actually altered* its communications" and "would have preferred to include a reference to a clearly identified federal candidate . . . but declined to do so because it would have required EMILY's List to fund the advertisements entirely with federal funds." Id.  Further the Court found that EMILY's List "has ordered its conduct in ways it otherwise would not have, in order to comply with the new allocation and solicitation regulations," and this was enough for standing for the Plaintiffs.  Id.

The Court in EMILY's List noted, however, that Plaintiff brought a facial challenge to the rules, not an as-applied challenge, and the standard for a facial challenge is that "an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Id. at 14 (quoting Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) (internal quotations omitted).  For the facial challenge standing argument, the Court held that even though Plaintiff had failed to "include specific allegations for First Amendment injuries suffered by parties not before the Court," the fact that EMILY's List had altered its own conduct to conform with the regulation implies that "other political committees likely

12

have as well," giving the Court sufficient evidence "to tilt the balance and conclud[e] that

EMILY's List has standing to assert its facial challenge." Id.   Additionally, the Fourth

Circuit has held,

> When a plaintiff faces a credible threat of prosecution under a criminal statute
> he has standing to mount a pre-enforcement challenge to that statute.  A non-
> moribund statute that "facially restrict[s] expressive activity by the class to which
> the plaintiff belongs" presents such a credible threat, and a case or controversy
> thus exists in the absence of compelling evidence to the contrary.   This
> presumption is particularly appropriate when the presence of a statute tends to
> chill First Amendment rights.

North Carolina Right to Life v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999).

### a. As-applied challenge

In this case, Plaintiff has filed both an as-applied and a facial challenge to the FEC

regulations and rules.  Regarding the as-applied challenge, even with the FEC's

assertions—that Plaintiff's communication in the ad"Change" does not fall within the

challenged regulations—this Court held that the threat of litigation "initiated by a private

citizen" is still a legitimate fear, enough to satisfy the standing requirements.  Virginia

Society for Human Life, Inc. v. FEC, 83 F. Supp. 2d 668, 674 (E.D.Va. 2000) ("VSHL")

(finding that FECA permits private individuals to sue to enforce FECA and that this "mere

possibility that such a challenge may be brought by a private citizen is enough" to "pose a

very real threat of prosecution.").  Because a private individual could bring a challenge

here, this should be satisfactory for standing.  Furthermore, in reading the "Change" ad, it is

clear that reasonable people could not differ that this advertisement is promoting the defeat

of Senator Obama.  The fact that the ad uses terminology satirizing the motto of the Obama

campaign—Change—and attacks the Senator on a very hot-button issue—abortion—it is clear the threat of litigation is present because of these ad's contents. A private citizen exposed to the "Change" ad may bring private civil litigation against RTAO, and would be justified in thinking that this advertisement should be regulated by section 100.22. This satisfies the standing requirement because Plaintiff "faces a credible threat of prosecution under a criminal statute." See Bartlett, 168 F.3d at 710.

Moreover, RTAO has filed a second preliminary injunction motion for another ad created entitled "Survivor," which the FEC has conceded will fall within the "express advocacy" provisions of 11 C.F.R. §§ 100.22, 114.15. (Def. FEC Mem. in Opp'n to Pl's Second Prelim. Inj. Mot. 4-6). Because a legitimate future threat of litigation is present with regard to the "Survivor" ad, and there is a current threat of private party litigation with regard to the "Change" ad, it is clear that a proper "case or controversy" exists with the as-applied challenge to the constitutionality of the challenged provisions.

b. Facial challenge

With regard to the facial challenge, a similar argument as the one presented in EMILY's List is present here. Plaintiff has failed to allege that other parties not before the Court have or are suffering First Amendment violations as was the case in EMILY's List. See 2008 WL 2938558, at *14. However, it was not fatal to plaintiffs in that case, nor should that be the case here. It is arguable that because it is an election season and RTAO has had to alter its conduct because of the FEC regulations, it is likely other individuals have considered creating advertisements, similar to those produced by RTAO. This should be enough to find standing for Plaintiff's facial challenge. If not, it is clear that RTAO has

14

satisfied standing for the as-applied challenge, and therefore jurisdiction is proper in this Court.[3]

The same arguments apply to the challenged provisions sections 100.57 and 114.15, therefore the standing challenges to these sections fail as well.

2.  PAC status - "Major Purpose"

The FEC asserts that RTAO's claim of unconstitutionality of the PAC test is not justiciable because RTAO would not qualify as a PAC, therefore there is only an abstract inquiry that is "not ripe or otherwise fit for judicial resolution." (Def. FEC Mem. 23.) The FEC's position is based solely on Plaintiff's statement in the complaint that "[RTAO] is not a . . . PAC under FECA because none of its communications will qualify as either a "contribution" or "expenditure" . . . It is also not a PAC because, . . . RTAO does not meet the constitutionally required 'major purpose' test." (Compl. ¶¶ 10-11.)  Plaintiff believes that it will be classified as a PAC by the FEC because the FEC's position that it is entitled to consider a variety of factors when considering PAC status, and the consideration of such

---

[3] The Department of Justice has also asserted a lack of standing argument against RTAO's preliminary injunction motion.  (Def. DOJ Mem. 1-4.) The DOJ asserts that the FEC has the "statutory authority to interpret FECA" and that the DOJ's authority "is limited to investigating and prosecuting persons who 'knowingly and willfully commit[ ] a violation of FECA or other federal criminal statutes.'" (Def. DOJ Mem. 2 (citing 2 U.S.C. § 437g(d)(1)).  The DOJ asserts that "Plaintiff cannot show that it has an objectively reasonable fear that engaging in the activities described in its complaint will expose Plaintiff to criminal prosecution" based on the FEC's position that the proposed ad is not within the scope of the regulations.  As stated above, in reading the "Change" and "Survivors" ads, it is clear both are expressly advocating the defeat of Senator Obama, and the fact that the DOJ is relying solely on the FEC's claim that the "Change" ad does not fall under regulations is not enough to dismiss for lack of standing.  If the FEC were wrong and this case does fall under express advocacy, then the DOJ would be free to commence criminal prosecution proceedings.  For this reason, the DOJ's claim of standing is rejected.

factors will make RTAO a PAC.  (Compl. ¶¶ 11-13.)  Further, Plaintiff states that it

"reasonably believes" it will be subject to an FEC and DOJ investigation and a possible

enforcement action potentially resulting in civil and criminal penalties based on the FEC's

alleged unconstitutional regulations involving "express advocacy," "contributions," and the

"major purpose test" for determining PAC status.  (Compl.¶ 21.)

Again, these present similar conclusions as the standing arguments of sections

100.22, 100.57, and 114.15.  For this reason, Defendant FEC's claim that standing is not

proper must fail.

### 3.  Final Agency Action

The FEC also takes the position that the policy challenged by the Plaintiff regarding

the definition of "political committee" is not final agency action, therefore, this claim is not

reviewable under the Administrative Procedure Act.  Final agency action combines the

agency's decision-making process and determines the rights and obligations of parties.

Bennett v. Spear, 520 U.S. 154, 177-78 (1997); Pac. Coast Fed. of Fisherman's Assn. v.

Gutierrez, No. 1:06-CV-245, 2007 WL 1752289, *7 (E.D. Cal. June 15, 2007) ("Whether

an action constitutes a final agency action is premised on the observation that the action

has 'no direct consequences' and services 'more like a tentative recommendation than a

final binding determination.'  In other words, if the agency action is purely advisory and in

no way affects the legal rights of the relevant actors it is not a 'final agency action' under the

APA.") (internal citations omitted).

The FEC is alleging that RTAO is challenging the Explanation and Justification set

forth in 72 Fed. Reg. 5595, and that this Explanation and Justification is not final agency action because it explains why a broader regulation was *not* adopted.  (Def. FEC Mem. 24.) Plaintiff's challenge to the definition of "political committee" is still valid, because the rule establishing what the FEC would consider as a "political committee" is a standard set by the FEC, even absent a definition.  The U.S. District Court for the District of Columbia ruled in 2007 that the FEC was permitted to refrain from ascertaining a specific rule for "major purpose," but this does not mean the rights and obligations of parties cannot be determined from the FEC's enforcement of the term "major purpose."  See Shays v. FEC, 511 F. Supp. 2d 19, 31 (D.D.C. 2007).

While there is no specific definition for "major purpose," the rights and obligations of parties can still be determined from the FEC rule, as enforcement power exists through the judicial construct of the term "major purpose."  Therefore, Defendant's claim that the challenged rule is not reviewable under the APA because it is not a final agency action fails.

C.  Likelihood of Success Claims

1.  "Express Advocacy" Claim - 11 C.F.R. § 100.22

Plaintiff asserts that 11 C.F.R. § 100.22(b) is void on its face because it is vague and overbroad, a violation of the First and Fifth Amendments to the U.S. Constitution.  (Pl. Compl. ¶ 29.)

Section 100.22(b) provides the definition of express advocacy, a term that is critical to electioneering communication regulations because corporations and labor unions may be

17

constitutionally prohibited from using general funds to "expressly advocat[e]" for or against the election of a candidate.  <u>McConnell</u>, 540 U.S. at 203 (2003); <u>MCFL</u>, 479 U.S. at 249. RTAO, a corporation that would be restricted by this provision, argues that the test codified in section 100.22(b) is void because it is vague.

In <u>Buckley v. Valeo</u>, the Supreme Court found that express language, deemed "magic words," were required in order to find the express advocacy that may be constitutionally limited through expenditure restraints.[4]  424 U.S. 1, 44 (1976).  From that decision, the FEC promulgated section 100.22.  The general test in <u>Buckley</u> was adopted by the Ninth Circuit in <u>Furgatch</u>, 807 F.2d 857 (9th Cir. 1987), where the court acknowledged the express advocacy test, but stated "speech need not include any of the words listed in <u>Buckley</u> to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate." <u>Id.</u> at 864-65.

This Court, in <u>VSHL</u>, found section 100.22 to be unconstitutional, rejecting the Ninth Circuit's adoption of the regulation in <u>Furgatch</u>.  <u>VSHL</u>, 83 F. Supp. 2d at 676.  This Court based its decision on the distinction made in <u>Buckley</u> between "express advocacy," that which in "express terms advocate the election or defeat of a clearly identified candidate," and "issue advocacy," which is not regulated by the FEC because the exchange of ideas is strongly protected by the First Amendment.  <u>Buckley</u>, 424 U.S. at 14, 44.

---

[4] Such magic words include "vote for," "elect," "support," and are included in 11 C.F.R. § 100.22(a), the preceding subsection to the subsection in dispute here.

This Court ruled that because section 100.22(b) regulated speech that did not contain the "magic words" of express advocacy, the FEC had exceeded their statutory authority.  VSHL, 83 F. Supp. 2d at 677 (noting that the Buckley court stated that express advocacy contains explicit words, while "issue advocacy" does not.  424 U.S. at 44.).  The Fourth Circuit affirmed this decision as far as the unconstitutionality of section 100.22(b), but stated that this Court's grant of a permanent injunction nationwide was too broad and should have only reached as far as the Fourth Circuit. Virginia Society for Human Life, Inc. v. FEC, 263 F.3d 379 (4th Cir. 2001).  Even though the Fourth Circuit affirmed this Court's decision, a clear statement was made that whether the express advocacy requirement imposed by the court was too strict and therefore would corrupt the idea of federal election laws, could only be changed or affirmed by "an imaginative Congress or from further review by the Supreme Court."  Id. at 392.

Such review by the Supreme Court occurred.  In 2003, the Supreme Court held in McConnell v. FEC that the Buckley Court's "express advocacy restriction was an endpoint of statutory interpretation, not a first principal of constitutional law." 540 US. at 190. In that case, the Court upheld BCRA's prohibition of corporation-funded communications that refer to federal candidates that did not have the "magic words." Id. at 206.  Justice Thomas's dissent stated that their decision in McConnell "overturned" all of the Courts of Appeals decisions, including past Fourth Circuit decisions in FEC v. Christian Action Network, Inc., 100 F.3d 1049 (1997) and VSHL.  This "overturning" of the Fourth Circuit decisions was not express, and the Supreme Court has not specifically stated that the

decision in VSHL is no longer good law.  However, from McConnell and the recent decision in WRTL, a new test has emerged virtually overruling this Court's decision in VSHL.  In WRTL, the Supreme Court upheld the BCRA restriction on corporate electioneering communications that are communications "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  Id. at 2667.  In upholding the BCRA restriction, the Court enumerated a test for determining if something is the "functional equivalent" of express advocacy—and thereby subject to the constitutional limitations. Id.  The test states that "an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  Id.  No element of "magic words" was implicated in WRTL, thereby impliedly upholding the decision in McConnell that the use of "magic words" was a form of "statutory interpretation not [a] constitutional command." McConnell, 540 U.S. at 191-92.

Most recently, the Fourth Circuit in North Carolina Right to Life, Inc. v. Leake, held a state statute invalid for defining express advocacy beyond the permitted scope. 525 F.3d 274 (4th Cir. 2008).  The Court held that the statute was invalid because it defined express advocacy using specific "contextual factors" such as "the timing of the communication in relation to the events of the day" and "the cost of the communication." Id. at 298. Consideration of these factors went well beyond WRTL's functional equivalent of express advocacy test.  Id. at 297.  After holding that the statute was invalid, the Court stated that "North Carolina remains free to adopt a definition of express advocacy consistent with the

standards approved by <u>McConnell</u> and <u>WRTL</u>."  <u>Id.</u> at 301.

In the present case, RTAO's first assertion of unconstitutionality is that section 100.22(b) is unconstitutional because it gives an alternative method of finding express advocacy not supported by Supreme Court precedent.  However, the test in section 100.22(b) is the same analysis as was enumerated in <u>WRTL</u>.  <u>WRTL</u> required that the ad be deemed express advocacy "only if the ad is susceptible to no reasonable interpretation other than an appeal to vote for or against a specific candidate."  127 S. Ct. at 2667. Section 100.22(b) states that express advocacy can be found if "reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s)."  Because section 100.22(b) is virtually the same test stated by Chief Justice Roberts in the majority opinion of <u>WRTL</u>, and that decision supercedes this Court's decision in <u>VSHL</u>, the test enumerated in section 100.22(b) to determine express advocacy is constitutional.

RTAO's second assertion of unconstitutionality is that the test is vague because it permits considerations of context (Compl. ¶¶ 29-33,) however the Supreme Court has clearly permitted such considerations.  <u>WRTL</u>, 127 S. Ct. at 2669 (holding that courts "need not ignore basic background information that may be necessary to put an ad in context—such as whether an ad 'describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of such scrutiny in the near future.'").

For this reason, and the reasons stated above, Plaintiff's assertion of

unconstitutionality of section 100.22(b) is unlikely to succeed on the merits.  As a showing

of likelihood of success on the merits is a key factor in determining whether or not to enjoin

a particular action, Plaintiff's claim should fail as to section 100.22, thereby prohibiting

injunction.

<u>2.  Solicitation Rule Claim - 11 C.F.R. § 100.57</u>

RTAO further claims that the solicitation rule enumerated in section 100.57 is

unconstitutionally vague and overbroad.  (Compl. ¶ 36.)  Section 100.57 deals with funds

received in response to solicitations and whether such funds are considered "contributions."

The language of the regulation is:

> (a) Treatment as contributions. A gift, subscription, loan, advance, or deposit of
> money or anything of value made by any person in response to any
> communication is a contribution to the person making the communication if the
> communication indicates that any portion of the funds received will be used to
> *support or oppose* the election of a clearly identified Federal candidate.

11 C.F.R. § 100.57 (emphasis added).  Plaintiff asserts that the use of the terms "support or

oppose" are not specific enough, are undefined, and "give inadequate notice to enforcers

and the regulated community of what these words encompass." (Compl. ¶ 36.)

The Supreme Court in <u>Buckley</u> also dealt with the definitions of "contribution" and

"expenditure" and found different constitutional requirements in the two terms.  The Court

stated that the term "contribution" did not need to be as narrowly tailored as "expenditure"

because contributions have "only a marginal restriction upon the contributor's ability to

engage in free communication." <u>Buckley</u>, 424 U.S. at 20-21.  The Court defined

contribution to include, "not only contributions made directly or indirectly to a candidate,

political party, or campaign committee, and contributions made to other organizations or individuals but earmarked for political purposes, but also all expenditures placed in cooperation with or with the consent of a candidate." Id. at 78. Thus, the Buckley Court created a broad standard for contributions. The Court construed expenditure narrowly to encompass "only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate" while finding that express advocacy is not confusing when tied to contributions because "of the limiting connotation created by the general understanding of what constitutes a political contribution." Id., at 24, 79-80. The Second Circuit further defined "earmarked for political purposes" by stating that communications may still fall within the reach of the pre-BCRA statute if "the contributions will be targeted to the election or defeat of a clearly identified candidate." FEC v. Survival Education Fund, Inc., 65 F.3d 285, 295 (2d Cir. 1995). Very recently, the U.S. District Court of the District of Columbia failed to enjoin application of section 100.57 and upheld the constitutionality of the section in EMILY's List, 2008 WL 2938558 (upholding the constitutionality of section 100.57); EMILY's List v. FEC, 362 F. Supp. 2d 43 (D.D.C. 2005) (denying the preliminary injunction). In EMILY's List, the court specifically upheld the use of "support or oppose" in the regulation because these words "provide explicit standards for those who apply them" and "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." 2008 WL 2938558, at *29 (citing McConnell, 540 U.S. at 170 n. 64 ("[T]hese words provide explicit standards for those who apply them and give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.")). Because a person of ordinary intelligence could determine the meaning of support or oppose, the Court found

23

the regulation to be constitutional and not vague or overbroad.

Plaintiff RTAO cites several cases where statutes that contained "support or oppose" were found to be unconstitutional, however, none of the cases cited refer to the terms "support or oppose" as the offending terms.  In <u>Leake</u>, the Fourth Circuit found the statute unconstitutional because the method of determining applicability was vague and overbroad, but stated clearly that North Carolina was "free to enforce all campaign finance regulations that incorporate the phrase 'to support or oppose the nomination or election of' a clearly identified candidate.'"  525 F.3d at 301.  By doing this the Court made clear the offending portion of the North Carolina statute was not the use of the terms "support or oppose," and suggested that these terms would be an appropriate standard for a revision of the statute. Further in <u>Bartlett</u>, the Court invalidated a statute defining "political committee" as any group "the primary or incidental purpose of which is to support or oppose any candidate or political party or to influence the result of an election." 168 F.3d at 712.  The offending part of this statute was the term "or to influence the result of an election," not "support or oppose." <u>Id.</u>  This was also the case in <u>Ctr. for Individual Freedom v. Carmouche</u>, where the Fifth Circuit narrowly construed the use of the term "or otherwise influencing" in the definition of "expenditure" to avoid unconstitutionality of the definition. 449 F.3d 655, 663 (5th Cir. 2006). The Fifth Circuit made no reference to the necessity to narrowly construe the term "support or oppose."

Because the case law and Supreme Court precedent make it clear that the use of "support or oppose" is not unconstitutionally vague, and these words have even been

suggested by the Fourth Circuit as a proper standard to use, <u>see</u> <u>Leake</u>, 525 F.3d at 301, it is unlikely Plaintiff would succeed on the merits of its claim that section 100.57 is unconstitutional.  For this reason, an injunction would be improper as to this particular claim.

### 3.  "Major Purpose" Test Claim

Plaintiff next contends that the FEC's PAC status policy goes beyond the test enumerated in <u>Buckley</u>, therefore going beyond its statutory authority and is, therefore, void.  In <u>Buckley</u>, the Supreme Court stated that political committees are "organizations that are under the control of a candidate or the *major purpose of which is the nomination or election of a candidate*." <u>Buckley</u>, 424 U.S. at 79 (emphasis added).  The Court goes on to say that expenditures of political committees are "campaign related." <u>Id.</u>  This is the "major purpose" test referred to by the parties and is currently the standard as to how to determine whether an organization can be regulated by FECA as a PAC.  The <u>Buckley</u> court did not elaborate on what a major purpose is, but in <u>MCFL</u>, the Court held that a right-to-life organization did not fit the standard set forth in <u>Buckley</u> because the "central organizational purpose is *issue* advocacy." <u>MCFL</u>, 479 U.S. at 252 n. 6 (emphasis added).

To determine what a "major purpose" is, courts have permitted evaluation of public statements, an organization's spending or contributions, letters to primary contributors, and other non-public statements.  <u>See</u> <u>FEC v. Malenick</u>, 310 F. Supp. 2d 230, 234-37 (D.D.C. 2004); <u>FEC v. GOPAC, Inc.</u>, 917 F. Supp. 851, 859, 864, 866 (D.D.C. 1996).  Courts have even mentioned that when an entity organizes itself as a 527 it "is inherently indicative of its

choice to principally engage in electoral activity, which goes a long way to satisfying the major purpose test." Shays v. FEC, 511 F. Supp. 2d 19, 30 (D.D.C. 2007). A declaration by the organization that they are *not* incorporated for an electioneering purpose is not dispositive. See Akins v. FEC, 101 F.3d 731, 743 (D.C. Cir. 1997) ("[I]t is the purpose of the organization's disbursements, not that of the organization itself, that is relevant.") (emphasis added). The Shays court states that "various activities and statements" must be examined to determine the major purpose. 511 F. Supp. 2d at 31.

The FEC rule is flexible with a "case-by-case analysis" of conduct including spending on Federal campaign activity, spending on other activities, analysis of public statements, declaration of purpose on website, fundraising appeals, and similar types of activities. 72 Fed. Reg. 5595, 5602. Because the FEC rule employs the same factors the Supreme Court has approved in these aforementioned cases, Plaintiff's claim of overbreadth appears to be lacking and therefore will likely not succeed on the merits.

RTAO further alleges that the FEC has failed to incorporate the Buckley standard and has therefore gone beyond its statutory authority by making the major purpose test to focus on "*federal* campaign activity." (Compl. ¶ 79) (emphasis added). There is really no difference between "campaign related," as enumerated in Buckley, and "campaign activity" as the FEC codified in the regulation. 72 Fed. Reg. at 5601. Defendant clarifies the reason it states "federal campaign activity," is to make clear major purpose test applies only to the election of federal candidates, not state or local ones. (Def. FEC Mem. 26.)

Because the FEC rule appears to consider the same factors as have been supported

26

and encouraged by the courts in determining a "major purpose," Plaintiff fails to demonstrate a likelihood of success on the merits with respect to this issue.

### 4.  Permissible Use of Funds Claim - 11 C.F.R. § 114.15

Lastly, RTAO asserts that 11 C.F.R. § 114.15 is unconstitutionally vague because it goes beyond the test enumerated in WRTL.  (Compl. ¶ 50.)  Section 114.15 regulates the permissible use of corporate and labor organization funds for certain electioneering communications.  11 C.F.R. § 114.15.  If an electioneering communication contains express advocacy, then the communication may be constitutionally regulated.  See id.  In WRTL, the Supreme Court held that only those advertisements which were found to be "express advocacy" or "the functional equivalent of express advocacy" could be restricted; all other limitations were unconstitutional. 127 S. Ct. 2670.  In order to determine whether an advertisement is "express advocacy" the Court stated that "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than that as an appeal to vote for or against a specific candidate." Id. at 2667.  The Court continued by providing reasons why WRTL's ad was not express advocacy or the functional equivalent of express advocacy:

> First their content is consistent with that of a genuine issue ad: The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position and urge the public to contact public officials with respect to the matter. Second, their content lacks indicia of express advocacy: The ads do not mention an election, candidacy, political party, or challenger; and they do not take position on a candidate's character, qualifications, or fitness for office.

Id.  By doing a side-by-side comparison, it is very apparent that the FEC's regulation simply

27

adopted the test enumerated in <u>WRTL</u> to create the electioneering communication regulation in section 114.15.  Subsection (a) states that restrictions on electioneering communications are limited to those which are "susceptible to no reasonable interpretation other than as an appeal to vote for or against a clearly identified Federal candidate."  11 C.F.R. § 114.15(a).  This is virtually the same definition enumerated in <u>WRTL</u>.  Further, the factors given in subsection (c) are those which were given to find the unconstitutionality in <u>WRTL</u>.  <u>Compare</u> <u>WRTL</u>, 127 S. Ct. at 2667, <u>with</u> 11 C.F.R. § 114.15(c).  Additionally, subsection (c)(3) states that "any doubt will be resolved in favor of permitting the communication." <u>Id.</u> at (c)(3).  It is clear that the regulation adopted by the FEC is precisely what the Supreme Court dictated should be the standard, and furthermore, the FEC broadened the rule by permitting that the disputes be decided in favor of communication, not restriction.

WRTL and <u>Leake</u> discuss the avoidance of "open-ended rough-and-tumble of factors" but only to the extent that an objective standard should be adopted in evaluating the substance of a communication, not the "intent and effect." <u>WRTL</u>, 127 S.Ct. at 2666; <u>Leake</u>, 525 F.3d at 282.  The provisions contained in 11 C.F.R. § 114.15 are the exact factors the Court used in <u>WRTL</u> to find that no express advocacy, or its functional equivalent existed.  The Court has not shunned the use of factors, but has simply insisted on the use of objective standards.  <u>WRTL</u>, 127 S.Ct. at 2666.  For these reasons, Plaintiff's assertion that section 114.15 is overbroad and vague is misplaced, and therefore RTAO fails to carry its burden of proving a likelihood of success on the merits.

For the reasons stated above, the likelihood of Plaintiff's success on the merits of all four claims of unconstitutionality is unlikely.

D.  Irreparable Harm

The next analysis to consider in a Preliminary Injunction is irreparable harm to the Plaintiff if the preliminary injunction is not granted.  This Court has held that "when an individual's free speech rights are infringed, irreparable harm is generally inflicted." Virginia Society for Human Life, Inc. v. Caldwell,  906 F. Supp. 1071, 1077 (1995) (citing Elrod v. Burns, 427 U.S. 347 (1976)).  In that case, Plaintiff was alleging unconstitutionality of a Virginia statute restricting the distribution of issue advocacy "voter guides. Id. at 1071. The court found the degree of harm to the Plaintiff was determined to be greater than the degree of harm to Defendant, because the only harm attributable to the Defendant was that voters would have less information about the origins of issue advocacy literature.  Id. at 1077.  Also, in Ireland, the court was faced with a similar challenge of vagueness and overbreadth regarding regulations concerning corporate financing of elections for public office and found "because of this vagueness, it is fair to say that the Center has been discouraged from engaging in speech safeguarded by the First Amendment.  This chill standing alone, constitutes irreparable injury." 2008 WL 1837324, at *5.

While RTAO asserts a chilling of speech which would constitute an irreparable harm, the evidence presented at the Hearing was clear: Plaintiff is free to disseminate their message and make any expenditures they wish.  Their only limitation is on contributions based on constitutionally permitted restrictions.  This Court finds that this does not amount

29

to enough harm to constitute irreparable harm.


E.  Balance of Harms and Public Policy

The next two factors, harm to Defendant and considerations of public policy, in this case, are intertwined.  The Supreme Court has stated that "[t]he presumption of constitutionality which attached to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of applicants in balancing hardships." Walter v. Nat'l Ass'n of Radiation Survivors, 468 U.S. 1323, 1324 (1984) (citing Marshall v. Barlow's, Inc., 429 U.S. 1347 (1977)). The Fourth Circuit found no harm to the defendant school board in Newsom because the Court found the regulation in question was likely unconstitutional, therefore enjoining its enforcement would cause no harm to the defendant.  Newsom, 354 F.3d at 261.  However, in this case, presumption of validity of the regulation must fall in favor of Defendants when considering balancing hardships.  Furthermore, it is unlikely the regulations will be found unconstitutional, so the harm to Defendant is likely should the injunction be granted. Additionally, "enjoining the disputed rules would undermine the FEC's efforts . . . because in place of the regulations, the public would find these portions of campaign finance laws suddenly unregulated." EMILY's List,  2008 WL 2938558, at *59.  Should this Court enter the injunction, the next two months of election law and enforcement would likely become a "wild west" of electioneering communication and contributions without the challenged regulations in place.  Defendant effectively argues that "enjoining application of the

challenged provisions could confuse political actors, allow improper use of corporate funds in the election process, sanction excessive campaign contributions, and deprive the public of important information."  (Def. FEC Mem. 10-11.)  For these reasons, the two factors of balancing harms and public policy considerations weigh in favor of Defendants.


## IV.  CONCLUSION

Because Plaintiff has failed to carry its burden of showing a likelihood of success on the merits and the balance of harms and public policy considerations weigh in favor of Defendants, this preliminary injunction motion is DENIED.


An appropriate Order shall issue.

_____/s/_____
James R. Spencer
Chief United States District Judge

Entered this  __24th__  day of September 2008