UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



| | |
|---|---|
| THE REAL TRUTH ABOUT OBAMA, INC., | |
| Plaintiff, | Action No. 3:08–CV–483 |
| v. | |
| FEDERAL ELECTION COMMISSION AND UNITED STATES DEPARTMENT OF JUSTICE, | |
| Defendant. | |

## MEMORANDUM OPINION

This matter comes before the Court on The Real Truth About Obama, Inc.'s ("RTAO") Motions for Preliminary Injunction and Summary Judgment and the Federal Election Commission's (FEC, "the Commission") and the Department of Justice's (DOJ) Motions for Summary Judgment. Having concluded that *Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010), has not changed the posture of RTAO's challenges, the Court grants summary judgment in favor of the FEC and DOJ and accordingly denies both of RTAO's Motions.

I. <u>Statement of the Case</u>

This case comes back to the Court on remand from the Supreme Court and, in turn, the Fourth Circuit. RTAO is a non-profit, Virginia corporation classified as a "political organization," and is thereby exempt from income taxation, under 26 U.S.C. § 527. RTAO believes that the FEC will deem it a "political committee" under Federal Election Campaign Act

1

(FECA). 2 U.S.C. §§ 431-55.

RTAO sued the FEC and DOJ on July 30, 2008, challenging the constitutionality of FEC regulations at 11 C.F.R. §§ 100.22(b), 100.57, and 114.15, as well as the FEC's policy for determining political committee status. Along with raising facial challenges to the regulations and the FEC's policy, RTAO challenged the constitutionality of the regulations' and policy's application to two RTAO advertisements. RTAO planned to run the first, entitled "Change," as an advertisement on political radio shows within sixty days of the 2008 presidential election. The advertisement reads:

> (Woman's voice) Just what is the real truth about Democrat Barack Obama's position on abortion?
>
> (Obama-like voice) Change. Here is how I would change America . . . about abortion:
> - Make taxpayers pay for all 1.2 million abortions performed in America each year
> - Make sure that minor girls' abortions are kept secret from their parents
> - Make partial-birth abortion legal
> - Give Planned Parenthood lots more money to support abortion
> - Change current federal and state laws so that babies who survive abortions will die soon after they are born
> - Appoint more liberal Justices on the U.S. Supreme Court
>
> One thing I would *not* change about America is abortion on demand, for any reason, at any time during pregnancy, as many times as a woman wants one.
>
> (Woman's voice). Now you know the real truth about Obama's position on abortion. Is this the change you can believe in?
>
> To learn more real truth about Obama, visit www.TheRealTruthAboutObama.com. Paid for by The Real Truth About Obama.

The second advertisement, entitled "Survivor," reads:

> (Nurse) The abortion was supposed to kill him, but he was born alive. I couldn't bear to follow hospital policy and leave him on a cold counter to die, so I held and rocked him for 45 minutes until he took his last breath.
>
> (Male voice) As an Illinois Democrat State Senator, Barack Obama voted three times to deny lifesaving medical treatment to living, breathing babies who survive abortions. For four years, Obama has tried to cover-up his horrendous votes by saying the bills didn't have clarifying language he favored. Obama has been lying. Illinois documents from the very committee Obama chaired show he voted against the bill that did contain the

2

clarifying language he says he favors.
Obama's callousness in denying lifesaving treatment to tiny babies who survive abortions reveals a lack of character and compassion that should give everyone pause.

Paid for by The Real Truth About Obama, Inc.

Prior to the 2008 presidential election, RTAO planned to disburse over $1,000 to air these

advertisements, which may bring RTAO within the FECA definition of "political committee."

*See* 2 U.S.C. § 431(4) (2002).

RTAO also planned to solicit donations with digital communications.  One such

communication reads:

Dear x,
    I need your help.  We're launching a new project to let the public know the real truth about the public policy positions of Senator Barack Obama.
    Most people are unaware of his radical pro-abortion views.  For example, when he was a state senator in Illinois, he voted against a state bill like the federal Born Alive Infant Protection Act.  That bill merely required that, if an abortionist was trying to abort a baby and the baby was born alive, then the abortionist would have to treat that baby as any other newborn would be treated.  Under this law, the baby would be bundled off to the newborn nursery for care, instead of being left on a cold table in a backroom until dead.  It seems like everyone would support such a law, but as an Illinois State Senator, Obama did not.  There are lots of other examples of his radical support for abortion, and we need to get the word out.  That's where you come in.
    A new organization has just been formed to spearhead this important public information effort.  It's called The Real Truth About Obama.  We plan to do some advertising.  Since we're not a PAC, there won't be any "vote for" or "vote against" type of ads—just the truth, compellingly told.
    A central planned project is directed at the world of the Internet.  We've already reserved www.TheRealTruthAboutObama.com to set up a website.  Here's the exciting part.  The website will feature a weekly postcard "signed" by "BarackObamabortion."  Like that?  While you are visiting the website, you can send the postcard by email to anyone you designate.  What could be easier?! And the postcards will be done in a catchy, memorable manner—the sort of thing that zips around the Internet.  Each postcard will feature well-documented facts about Obama's views on abortion.
    The postcards will also send people to the website for more real truth about Obama, but we also plan to do a radio ad to do that too.  This radio ad will give the real truth about Obama's abortion position—all properly documented, of course.  Notice the "Truth" part of our name.
    Of course it takes money to develop, host, and maintain a hot-topic website, and to hire the people who specialize in getting things noticed on the Internet (it's called viral marketing).  So we need your help.  We need for you to send us money.  As much as you can donate.  Right away.  We need to get the word out.  We know how.  We're ready to roll.  Now we need you.

                        Your friend for truth,
                            x

> P.S. — Please send your check today.  Time is of the essence.  Please send the largest
> gift you can invest in this vital project.  Together we can get the word out.

RTAO planned to solicit over $1,000 worth of donations through communications such as this
one, which also might make it a political committee.

On July 30 and August 20, 2008, RTAO moved for separate preliminary injunctions
against the FEC and DOJ, urging the Court to prohibit the FEC from enforcing the
aforementioned regulations and policy with respect to "Change" and "Survivor."  RTAO first
argued 11 C.F.R. § 100.22(b), which provides a totality-of-the-circumstances, context-specific
definition of "express advocacy," is overbroad and vague.[1]  § 100.22(b) clarifies the definition of
"expenditure" and "independent expenditure," limiting those to expenses expressly advocating
the election or defeat of a Federal election candidate.  *See* 2 U.S.C. §§ 431(9) & (17).  In turn,
whether an expense is an "independent expenditure" determines whether the expense must be
disclosed, and whether an organization makes more than $1,000 in "expenditures" helps
determine whether the organization is a political committee.[2]  *See* 2 U.S.C. §§ 431(4) & 434(c).

RTAO also contended that the FEC's political committee case-by-case enforcement
policy was overbroad and vague.  In *Buckley v. Valeo*, the Supreme Court limited the definition
of political committee in 2 U.S.C. § 431(4) to organizations "under the control of a candidate" or
"the major purpose of which is the nomination or election of a candidate."  424 U.S. 1, 79
(1976).  The FEC takes a flexible, case-by-case approach to determining whether an organization

---

[1]  11 C.F.R. § 100.22(b) provides that a communication "expressly advocates" for a candidate's election or defeat when "taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy for the election or defeat of one or more clearly identified candidate(s) because—
> (1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and
> (2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action."

[2]  § 100.22(b) also helped implement the ban on corporate and union expenditures at 2 U.S.C. § 441b until the Supreme Court overturned the ban in *Citizens United v. Fed. Election Comm'n*.  *See* 130 S. Ct. 876, 913 (2010).

is a political committee. It considers whether several factors—such as the organization's level of spending on Federal campaigns, public statements, and fundraising appeals—lead to the conclusion that the organization's major purpose is the election or defeat of a Federal candidate. *See* Political Committee Status, Supplemental Explanation and Justification, 72 Fed. Reg. 5595, 5597, 5601 (Feb. 1, 2007). Political committees are subject to disclosure requirements and contribution limits—except where the political committee makes only independent expenditures, in which case it may receive unlimited contributions. *See SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686 (D.C. Cir. 2010). *See* 2 U.S.C. §§ 434, 441a(a)(1)(C), and 441a(a)(3). Political committees can make unlimited independent expenditures. *See Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480 (1985).

This Court denied both preliminary injunction motions on September 24, 2008.[3] Applying the Fourth Circuit's preliminary injunction standards from *Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.*, the Court concluded RTAO was unlikely to prevail on any of its four claims. 2008 WL 4416282, at *9-13 (E.D. Va. 2008). *See* 550 F.2d 189 (4th Cir. 1997). As to its claim that § 100.22(b) is overbroad and constitutionally vague, the Court concluded that § 100.22(b) implemented "virtually the same test" defining the functional equivalent of express advocacy the Supreme Court enunciated in *Federal Election Commission v. Wisconsin Right to Life, Inc.* 2008 WL 4416282, at *11. *See* 551 U.S. 449, 469-70 (2007). The Court further predicted RTAO's challenge to the FEC's political committee enforcement policy was unlikely to succeed, since case law permitted the Commission to use the factors it did to assess an organization's status. 2008 WL 4416282, at *14. The Court also decided that the balance of

---

[3] RTAO originally challenged FEC regulations at 11 C.F.R. §§ 100.57 and 114.15, but it has withdrawn these challenges. After the D.C. Circuit declared § 100.57(a) unlawful in *Emily's List v. FEC*, the FEC ceased enforcing § 100.57(a) on April 18, 2010. *See* 581 F.3d 1 (D.C. Cir. 2009). The FEC ceased enforcing § 114.15 after the Supreme Court invalidated FECA's ban on corporate independent expenditures in *Citizens United*.

harms and the public interest weighed against granting RTAO injunctive relief. 2008 WL
4416282, at *16.

The Fourth Circuit affirmed this Court's denial of the preliminary injunctions. Finding
the *Blackwelder* standard "in fatal tension" with the Supreme Court's decision in *Winter v.
Natural Resources Defense Council*, the Fourth Circuit panel upheld this Court's decision using
the stricter preliminary injunction standards set out in *Winter*. *The Real Truth About Obama,
Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009). *See Winter*, 129 S. Ct. 365, 374-76 (2008). The
panel noted RTAO bore a "heavy burden in showing its likelihood of success," given the
stringency of the preliminary injunction standards and the "complicated" and "developing" area
of law the motions implicated. 575 F.3d at 349. The panel held RTAO did not carry that
burden, for reasons similar to those this Court cited in arriving at the same conclusion.

RTAO filed a petition for writ a certiorari in December 2009. Roughly a month later, the
Supreme Court struck down the ban on general treasury corporate and union expenditures as
unconstitutional in *Citizens United*. 130 S.Ct. at 913. *See* 2 U.S.C. § 441b (2002). The Court
overturned *Austin v. Chamber of Commerce*, which permitted a state-law restriction on corporate
expenditures, and *McConnell v. FEC*, which previously upheld the ban at § 441b. 494 U.S. 652
(1990); 540 U.S. 93, 209 (2003). In striking down § 441b, the Court concluded *Austin*'s
rationale—limiting the influence of "the corrosive and distorting effects of immense aggregations
of wealth" in election campaigns—did not justify a prohibition on a form of political speech. 130
S.Ct. at 903; *Austin*, 494 U.S. at 660. Additionally, the Court reasoned that the interest in
preventing the appearance of corruption did not justify a ban on corporate and union expenditures,
just as the *Buckley* Court had concluded with respect to individual and political committee
expenditures. 130 S.Ct. at 908. Finally, the Court summarily dispensed with the argument that

6

the ban protected shareholders who disagreed with a corporation's decision to make an expenditure on behalf of a particular candidate. *Id.* at 911.

In its petition for writ a certiorari, RTAO posed three questions for the Supreme Court, the first two of which engaged RTAO's assertion that the First Amendment requires special preliminary injunction standards. *See* Cert. Pet. at i, *Real Truth About Obama v. FEC*, 130 S. Ct. 2371, 2009 WL 4953054 (Dec. 16, 2010) (No. 09-724). The Solicitor General's response brief asked the Court to vacate the Fourth Circuit's judgment with respect to RTAO's challenges to §§ 100.57 and 114.15, remand with instructions to dismiss those claims as moot, and deny the petition in all other respects. Brief for Respondents, *Real Truth About Obama, Inc. v. FEC*, 130 S. Ct. 2371, 2010 WL 1130084 (March 24, 2010) (No. 09-724). On April 26, 2010, the Supreme Court vacated the Fourth Circuit's judgment and remanded "for further consideration in light of [*Citizens United*] and the Solicitor General's suggestion of mootness." *Real Truth About Obama v. FEC*, 130 S. Ct. 2371 (2010). The Fourth Circuit remanded to this Court and repeated the Supreme Court's instructions. *Real Truth About Obama v. FEC*, 607 F.3d 355 (4th Cir. 2010).

In addition to seeking preliminary relief, RTAO also moves for summary judgment on its challenges to § 100.22(b) and the FEC's political committee status policy. The DOJ and FEC argue RTAO warrants neither form of relief and moves for summary judgment. The Court agrees with the FEC and DOJ.


II. RTAO's Claims for Preliminary Relief Are Moot

The Commission argues RTAO's claims for preliminary relief are moot. The Court agrees. Federal courts may only adjudicate live cases or controversies. *See Marshall v. Meadows*, 105 F.3d 904, 906 (4th Cir. 1997). A case or controversy is no longer live, and

7

therefore moot, when there is no active dispute for the court to resolve or the parties lack a

"legally cognizable interest" in the outcome. *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir.

2008) (citations omitted). In deciding whether a case is moot, the Fourth Circuit requires the

plaintiff to be able to prove his standing throughout the litigation. *Townes v. Jarvis*, 577 F.3d

543, 546 (4th Cir. 2009). *See United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397

(1980).

RTAO's claims for preliminary relief are moot. Preliminary relief is not appropriate

where permanent relief will issue simultaneously and will immediately bind the parties with

respect to any future RTAO advertisements. The purpose of a preliminary injunction lies in

preserving the court's power to award meaningful relief after a merits decision during the

pendency of litigation. *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and

Procedure* § 2947 (2d ed. 2010). There will be no such pendent period here.

Additionally, since the election period for which the preliminary injunction would lie has

passed, there is no need for the Court to preserve its power to provide meaningful relief. Hence,

though RTAO may be entitled to relief for a future election cycle, the passing of the 2008

election means that RTAO is not suffering any injury that preliminary relief can remedy.

This case is analogous to *Independence Party of Richmond County v. Graham*. 413 F.3d

252 (2d Cir. 2005). There, a district court handed down a preliminary injunction specifically

requiring a local board of elections to permit non-members of the Independence Party to vote in

the party's upcoming primary. *Id.* at 255. The Second Circuit, entertaining an appeal of the

preliminary injunction after the primary election, concluded the appeal was moot. *Id.* As far as

the party's request for preliminary relief was concerned, the controversy was mooted by the

passing of the primary election. *Id.* at 255. As the panel explained, the primary election was an

event occurring during the appeal's pendency that made it "impossible for the court to grant any effectual relief whatever to the prevailing party," requiring the court to "dismiss the case, rather than issue an advisory opinion." *Id.* (citations omitted). Similarly, the opportunity for the Court to award preliminary relief to RTAO has passed, and the Court declines to issue an advisory opinion regarding its claims for preliminary relief.

By its own admission, RTAO seeks not merely two preliminary injunctions but special preliminary injunction standards governing First Amendment claims in the area of political speech. No matter how convincingly RTAO argues in favor of such standards, the Court could not issue them, since the Fourth Circuit reissued the portion of its first opinion applying *Winter*'s preliminary injunction standards to this case. 607 F.3d 355. *See Real Truth About Obama*, 575 F.3d at 345-47. Even if the Court could fashion the special standards RTAO seeks, the Court does not believe the Supreme Court has directed it to do so. To be sure, the Supreme Court's instruction to consider RTAO's claims "in light of" *Citizens United* requires this Court to consider whether *Citizens United* strengthened RTAO's claims for permanent relief. However, the Court does not read the Supreme Court's instruction as directed specifically to RTAO's certiorari questions about the proper preliminary injunction standards applicable to RTAO's claims. The Supreme Court has described its decision to grant certiorari, vacate a lower court judgment, and remand the case as a "cautious and deferential" measure designed to "assist[] the court below by flagging a particular issue that it does not appear to have fully considered" and "assist[] this Court by procuring the benefit of the lower court's insight." *Lawrence v. Chater*, 516 U.S. 163, 167 (1996). Hence, the Court reads the Supreme Court's remand order as merely an instruction to consider whether *Citizens United* altered the law governing RTAO's claims for permanent relief, rather than a command to fashion special preliminary injunction standards for

9

RTAO's claims.

III. RTAO's Claims for Permanent Relief Are Not Moot

The Commission and the DOJ also argue that RTAO's claims for permanent relief are moot. The Court disagrees. As a rule, a claimant no longer suffers injury-in-fact, mooting the parties' controversy, when the opposing party ceases the conduct that gave rise to the injury. *Incumaa v. Ozmint*, 507 F.3d 281, 286-87 (4th Cir. 2007). Where the claimant has a reasonable expectation that the opposing party will reinstate the offending conduct, however, the Supreme Court permits courts to consider such a dispute as "capable of repetition, yet evading review." *Wis. Right to Life*, 551 U.S. at 449. The exception applies where (1) the challenged action is too short in duration to be fully litigated prior to cessation, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. *Id.*

In *North Carolina Right to Life Committee Fund for Independent Political Expenditures v. Leake*, 524 F.3d 427 (4th Cir. 2008), a candidate who participated in the 2006 North Carolina Supreme Court election challenged the state's scheme providing optional public campaign financing. *Id.* at 432. Additionally, two political committees joined the challenge, alleging they chose not to make expenditures on behalf of candidates who did not participate in the funding scheme, for fear that the expenditures might result in the disbursement of funds to a candidate the organizations opposed. *Id.* at 434. The dispute reached the Fourth Circuit after the 2006 election, at which time the candidate had not indicated he planned to run for office in the next election, and the committees had not indicated they planned to participate in future elections. *Id.* at 435.

The Fourth Circuit held the dispute fit "comfortably" within the "capable of repetition,

10

yet evading review" exception to the mootness doctrine. *Id.* at 435 (citing *Wis. Right to Life*, 551 U.S. at 449). The panel determined that the candidate and political committees had reasonable expectations that the North Carolina funding scheme would apply to them in future election cycles. *Id.* In so ruling, the panel expressly rejected the argument that an ex-candidate's claims are "capable of repetition, yet evading review" only if the ex-candidate specifically alleges his intent to run for office in future elections. *Id.*

*Leake* controls this case. RTAO's challenges fit "comfortably" within the "capable of repetition, yet evading review" exception to the mootness doctrine. *Id.* at 435. RTAO reasonably expects the FEC to apply § 100.22(b) and its political committee status policy in future election cycles. Under *Leake*, that expectation creates a live controversy even in lieu of a statement of RTAO's intent to make the communications in a future election cycle.

## IV.  The Court Awards Summary Judgment for the FEC and DOJ

The record contains no dispute over an issue of material fact. Therefore, the Court may render a decision as a matter of law. RTAO challenges § 100.22(b) and the FEC's political committee status policy as unconstitutionally vague and overbroad. A restriction is unconstitutionally vague on its face if it fails to give "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *United States v. Whorley*, 550 F.3d 326, 333 (4th Cir. 2008). In a facial challenge to a law on First Amendment grounds, an overbreadth challenge will succeed if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008).

11

A. *Standard of Review*

The parties and amicus disagree over the applicable standard of review. Since *Buckley v. Valeo*, the Supreme Court has applied different standards of review to expenditure limits, disclosure requirements, and contribution limits. Expenditure limits, which restrict "the number of issues discussed, the depth of their exploration, and the size of the audience reached," are subject to strict scrutiny. *Buckley*, 424 U.S. 1, 19. By contrast, a contribution limit "entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20. Hence, contribution limits are subject to intermediate scrutiny; a contribution limit is valid if it is "closely drawn to match a sufficiently important interest." *McConnell*, 540 U.S. at 136. *See Citizens United*, 130 S.Ct. at 909. Similarly, disclosure requirements are subject to exacting scrutiny, such that the Government must demonstrate that a "relevant correlation" or a "substantial relation" exists between the governmental interest and the information required disclosed. *Buckley*, 424 U.S. at 64 (citations omitted). *See Reed v. Doe*, 130 S.Ct. 2811, 2818 (2010); *Citizens United*, 130 S.Ct. at 914.

RTAO contends strict scrutiny applies to § 100.22(b) and the political committee status policy, but that argument is incorrect. The nature of the substantive regulations that § 100.22(b) and the FEC's political committee status policy implement determines the appropriate standard of review. Neither of challenged provisions implements a limitation on RTAO expenditures. After *Citizens United*, § 100.22(b) informs the definition of "independent expenditure" in 2 U.S.C. § 431(17), and in turn informs whether disclosure of an independent expenditure is required under 2 U.S.C. § 434(c). § 100.22(b) also informs whether an organization has spent over $1,000 in "expenditures" under 2 U.S.C. § 431(4), a factor the FEC considers when

12

determining whether an organization is a political committee. Since it effectuates disclosure requirements, § 100.22(b) is subject to exacting scrutiny.

Similarly, for RTAO, the FEC's political committee status policy effectuates a disclosure requirement subject to exacting scrutiny. Political committees that make only independent expenditures may receive unlimited contributions and are subject only to disclosure requirements. *See SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010). Since RTAO plans to make only independent expenditures, it may receive unlimited contributions.[4] Therefore, exacting scrutiny is the proper standard of review. Hence, with respect to both of RTAO's challenges, the questions before the Court are whether a "relevant correlation" or a "substantial relation" exists between the governmental interest underlying the disclosure rules implemented by § 100.22(b) and the FEC policy and the information those rules require disclosed. *Buckley*, 424 U.S. at 64 (citations omitted).

### B.  § 100.22(b), "Expressly Advocating"

First, RTAO argues § 100.22(b) is unconstitutionally vague. In relevant part, § 100.22(b) states that a communication is express advocacy when

> taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because (1) [t]he electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and (2) [r]easonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

RTAO contends the phrase "electoral portion" and words "encourages," "actions," and "suggestive" are ambiguous. It further argues the § 100.22(b) allows reference to external

---

[4] RTAO's Articles of Incorporation prevent the organization from contributing to any candidate, and the organization intends only to make independent communications. (Am. Compl. ¶ 12; RTAO Mot. for Sum. J. 4-8.)

factors, because the regulation speaks of "limited reference to external events, such as the proximity to the election[.]" According to RTAO, *Wisconsin Right to Life* prohibits the FEC from considering external factors when deciding whether a communication is express advocacy. *See* 551 U.S. at 473-74.

§ 100.22(b) is consistent with *Wisconsin Right to Life*'s appeal-to-vote test. As the controlling opinion in that case pointed out, the requirement that an advertisement be subject to "no reasonable interpretation" other than an appeal to vote for or against a candidate satisfies any vagueness concerns. 551 U.S. at 470, 474 n.7. Both tests are objective: the language of the appeal-to-vote test limiting express advocacy advertisements to those in which "no reasonable person" could disagree about their message mirrors § 100.22(b)'s limitation that "[r]easonable minds [cannot] differ" about an advertisement's message. *Id.* In fact, § 100.22(b) provides the further requirement that the "electoral portion" of the advertisement be "unmistakable, unambiguous, and suggestive of only one meaning." § 100.22(b) and the "appeal to vote" test require an advertisement to focus on a "specific" or "clearly identified" candidate. Additionally, both tests disallow consideration of the speaker's subjective intent. *Compare Express Advocacy; Independent Expenditures; Corporate and Labor Expenditures*, 60 Fed. Reg. 35,292, 35,295 (July 6, 1995) ("[T]he subjective intent of the speaker is not a relevant consideration[.]") *with* 551 U.S. at 472 ("To the extent th[e] evidence goes to WRTL's subjective intent, it is . . . irrelevant."). The Fourth Circuit has concluded that § 100.22(b) is sufficiently similar to the appeal-to-vote test to likely pass constitutional muster. *Real Truth About Obama*, 575 F.3d at 349.

RTAO also overstates the degree to which § 100.22(b) permits consideration of external factors. While Chief Justice Roberts cautioned that "contextual factors . . . should seldom play a

14

significant role in the inquiry," he further explained that "[c]ourts need not ignore basic background information that may be necessary to put an ad in context." *Wis. Right to Life*, 551 U.S. at 449. § 100.22(b) faithfully marries these directions by allowing only "*limited* reference to external events." § 100.22(b) (emphasis added). RTAO reads this phrase like an invitation for courts and regulators to consider numerous contextual factors surrounding the advertisement, such as, the time of day or the geographic location in which the advertisement airs. The Court disagrees with this reading. The phrase is best read as a caution rather than an invitation, warning regulators to only consider "basic background information . . . necessary to put [the] ad in context." *Wis. Right to Life*, 551 U.S. at 449. Therefore, § 100.22(b)'s reference to "external events" does not broaden the provision beyond Chief Justice Roberts's test.

RTAO argues that *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008), requires the conclusion that § 100.22(b) is unconstitutional. In *Leake*, a North Carolina statute defined communications made "to support or oppose the nomination or election of one or more clearly identified candidates." *Id.* at 280. The statute in turn implemented disclosure obligations and contribution limits under North Carolina law. *Id.* The statute classified a communication as supporting or opposing a clearly identified candidate if it used "magic words" or, alternatively, if its "essential nature . . . goes beyond a mere discussion of public issues in that [it] direct[s] voters to take some action to nominate, elect, or defeat a candidate in an election." *Id.* If the "essential nature" of the advertisement was unclear, the statute permitted regulators to consider "contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to significant number of registered voters for that candidate's election, and the cost of the communication[.]" *Id.* at 281.

The Fourth Circuit held the statute unconstitutional, concluding that the statute regulated a broader range of speech than the functional equivalent of express advocacy. *Id.* at 282-83. The statute regulated communications other than those "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id.* at 283. *See Wis. Right to Life*, 551 U.S. at 470. According to the panel, the statute's standard, directing regulators to consider how a "reasonable person" would interpret four "contextual factors," permitted an "*ad hoc*, totality of the circumstances-based approach [that] provides neither fair warning to speakers that their speech will be regulated nor sufficient direction to regulators as to what constitutes political speech." *Id.* The panel further reasoned that the multiple factors the statute allowed regulators to consider—such as the cost and distribution of the communication—risked regulation of advertisements susceptible to more than one interpretation. *Id.* at 284.

*Leake* struck down a functional equivalence provision significantly broader and less precise than § 100.22(b). Most obviously, the North Carolina provision allowed regulators to make a wide-ranging inquiry into the context surrounding an advertisement, including the time of day the advertisement aired, the amount of money spent on the advertisement, and the number of voters in the geographic area to which the advertisement was targeted. By contrast, § 100.22(b) expressly cautions regulators and courts against too strongly considering the context of the advertisement. Additionally, *Leake* struck down an express advocacy definition that implemented contribution limits, while § 100.22(b) effectuates only disclosure requirements. *Id.* at 280.

RTAO further contends that § 100.22(b) applies only to electioneering communications.[5] The Court disagrees. The Fourth Circuit held § 100.22(b) was likely constitutional even though

---

[5] An "electioneering communication" is a broadcast, cable, or satellite communication which refers to a clearly identified candidate for Federal office and airs less than 60 days prior to a general election or 30 days prior to a primary election. 2 U.S.C. § 434(f)(3).

the provision does not only apply to electioneering communications.  As the panel explained,

> [C]onsistent with *Wisconsin Right to Life* and unlike the statute considered in *Leake* [525 F.3d at 283-84], § 100.22(b) cabins the application of the regulation to communications that "could *only* be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s)" . . . and where "[r]easonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action."  By limiting its application to communications that yield no other interpretation but express advocacy as described by *Wisconsin Right to Life*, § 100.22(b) is likely constitutional.

*Real Truth About Obama*, 575 F.3d at 349 (citing *Wis. Right to Life*, 551 U.S. at 469-70).

Furthermore, in *Citizens United*, the Supreme Court applied the appeal-to-vote test to an

electioneering communication without ever stating that the advertisement's status as an

electioneering communication was a prerequisite to application of the test.

     *Citizens United* does not change the Court's analysis of § 100.22(b).  RTAO argues that

*Citizens United* signaled a general reassertion of protection for issue advocacy groups and a

paring-down of the zone of express advocacy.  Specifically, RTAO suggests the Supreme

Court's treatment of 11 C.F.R. § 114.15 dictates that § 100.22(b) is unconstitutional.  In *Citizens*

*United*, the Supreme Court cited the complexity and ambiguity of the case-by-case nature of the

FEC regulation regime as a reason for engaging in facial review of § 441b.  130 S.Ct. at 895-96.

The Supreme Court singled out § 114.15, deriding the regulation as creating an "ambiguous

test[]" that allowed the FEC "to select what political speech is safe for public consumption."  *Id.*

The Supreme Court cited the "ongoing chill upon [protected] speech" caused by § 114.15 as a

basis for facially reviewing § 441b.

     RTAO reads the Supreme Court's criticism of § 114.15 to demonstrate the invalidity of

any totality-of-the-circumstances test that implements campaign finance regulations.  The Court

disagrees with this reading.  Initially, it bears pointing out that § 114.15 implemented a test

drastically more complex than § 100.22(b).  The Supreme Court described § 114.15 as a "two-

part, 11-factor balancing test," and indeed the regulation provides a rather dizzying array of considerations the regulator is to take into account in determining whether a communication is an appeal to vote for a candidate. *Id.* By contrast, § 100.22(b) limits the regulator's reference to "external events." It mandates an objective standard in which a communication must "only" be interpreted by a "reasonable person" to qualify as express advocacy. It directs the regulator to the "electoral portion" of the advertisement and requires that portion be "unmistakable, unambiguous, and suggestive of only one meaning." Finally § 100.22(b) requires that "reasonable minds [cannot] differ" as to whether the advertisement encourages the defeat or election of a candidate that is "clearly identified."

Moreover, the Court cannot agree that the Supreme Court's discursion on § 114.15 indicates that § 100.22(b) is unconstitutional, given that the Court applied the appeal-to-vote test in *Citizens United*. The Court rejected Citizens United's argument that the communication at issue was not the functional equivalent of express advocacy. *Id.* at 889-90. The Court described *Hillary: The Movie* as "*in essence* . . . a feature-length negative advertisement that urges viewers to vote against Senator Clinton for President." *Id.* at 890 (emphasis added). The Court concluded the film was the functional equivalent of express advocacy by applying the appeal-to-vote test, which the Fourth Circuit described as "consistent" with § 100.22(b). *Id.* at 889-90; *Real Truth About Obama*, 575 F.3d at 349.

The Supreme Court laid down the appeal-to-vote test when it considered the constitutionality of § 441b, a direct restraint on speech. *See Wis. Right to Life*, 551 U.S. at 469-70. The Court further applied the test when it struck down § 441b in *Citizens United*, leaving any test for defining the functional equivalent of express advocacy, such as § 100.22(b), to implement disclosure requirements. The Supreme Court has never backed off its judgment that

18

disclosure requirements effectuate the legitimate government interest of providing the electorate with information about the sources of campaign-related spending, which in turn allows voters to make informed choices. *See Citizens United*, 130 S.Ct. at 913-14; *McConnell*, 540 U.S. at 197. Therefore, the Supreme Court uses the appeal-to-vote test, which plainly calls for a totality-of-the-circumstances inquiry, to implement disclosure requirements. By mirroring the Supreme Court's appeal-to-vote test, § 100.22(b) ensures a relevant correlation between the Commission's interest in providing voters information and the information required disclosed when § 100.22(b) is applied.

No evidence before the Court indicates § 100.22(b) is unconstitutional as applied to "Change" and "Survivor." "Change" is plainly the functional equivalent of express advocacy. It is a genuine candidate advertisement. It focuses entirely on a single candidate and examines his position on abortion, a perennial and intensely-contested issue. The advertisement also bears numerous "indicia of express advocacy." *Wis. Right to Life*, 551 U.S. at 470. It describes then-Senator Obama's positions on abortion in a manner that a voter who supports greater restrictions on abortion would find repugnant, including that he would make taxpayers pay for "all 1.2 million" abortions in the United States and that he would ensure the secrecy of minor girls' abortions. Additionally, it co-opts Obama's presidential campaign slogan in a manner designed to make him less attractive as a candidate.

"Survivor" is more obviously the functional equivalent of express advocacy. Because the advertisement focuses entirely on then-Senator Obama's position on abortion, "Survivor" is a genuine candidate advertisement. It bears even stronger indicia of express advocacy than "Change." The advertisement calls Senator Obama's votes on state abortion legislation "horrendous." It claims he "tried to cover-up" those votes and lied about them. The

19

advertisement calls Senator Obama "callous." Hence, if the FEC deemed "Change" and "Survivor" express advocacy using § 100.22(b), that application would not be unconstitutional.

RTAO has also fallen short of demonstrating that the disclosure requirements § 100.22(b) implements are unduly burdensome as applied to it. The Supreme Court exempts from application of disclosure requirements organizations that demonstrate "a reasonable probability that the group's members would face threats, harassment, or reprisals if their names were disclosed." *Citizens United*, 130 S.Ct. at 915. RTAO provides no evidence that its donors would risk harassment.

### C. *Political Committee Status Policy*

#### 1. RTAO has standing to challenge the policy.

RTAO briefly challenges the policy by which the FEC determines whether an organization is a political committee. *See* 2 U.S.C. § 431(4). The Commission argues that RTAO lacks standing to raise this challenge, since RTAO has not demonstrated that it is a political committee and contends that it does not meet the major purpose test. The Court disagrees. In order to establish its standing to sue, RTAO must show (1) an injury in fact, (2) a causal connection between its injury and the defendant's conduct, and (3) the likelihood that the Court will redress the injury with a favorable decision. *Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 386 (4th Cir. 2001). When a party brings a preenforcement challenge to an agency regulation, it must allege "an intention in a course of conduct arguably affected with a constitutional interest," along with "a credible threat of prosecution" under the regulation. *Id.* (citing *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

RTAO has demonstrated its standing to challenge the Commission's political committee

20

status policy. RTAO stated its intention to purchase time to air "Change" and "Survivor." At

the very least, these two advertisements merit examination by the Commission as possible

express advocacy. An organization's level of spending on Federal campaign activity is among

the factors the FEC uses in determining whether an organization is a political committee. *See*

Political Committee Status, Supplemental Explanation and Justification, 72 Fed. Reg. 5595, 5601

(Feb. 1, 2007). Should the FEC deem "Change" and "Survivor" express advocacy, the

advertisements would figure significantly into the FEC's determination of RTAO's political

committee status. Therefore, RTAO has alleged an intention to engage in constitutionally

protected political speech and RTAO is subject to a credible threat to prosecution under the

FEC's policy.[6]

### 2. The Court denies RTAO's challenge to the policy.

The FEC has declined to adopt a regulation for determining whether an organization is a

political committee. *Cf. Shays v. Fed. Election Comm'n*, 511 F.Supp.2d 19 (D.D.C. 2007).

Instead, the Commission undertakes a fact-intensive, case-by-case adjudication to determine

whether a group's major purpose is a Federal candidate's election or defeat and therefore subject

to the regulatory requirements that status entails. 72 Fed. Reg. at 5601. The FEC considers

whether the group spends money extensively on campaign activities such as canvassing or phone

banks, or on express advocacy communications. *Id.* at 5604. The Commission looks to the

organization's public statements and the content of its fundraising appeals, including email

messages, fundraising appeals, and personal meetings. *Id.* at 5601, 5604-05. The group's

contribution sources, internal documents, and internal statements have also figured into the

Commission's adjudications. *Id.* at 5601, 5605.

---

[6] The FEC also renews its argument, denied by the Court in its previous opinion, that the political committee status policy is not a final agency action subject to judicial review. The Court notes that the Commission raises the argument here simply to preserve it for appeal.

RTAO argues the Commission's multi-factored approach to deciding political committee status fails to provide RTAO fair notice of its status and encourages selective enforcement. It further contends FEC adjudication pursuant to a multi-factored inquiry burdens speech, regardless of the outcome of any adjudication. The Court disagrees. The FEC is correct that ascertaining an organization's single major purpose is an inherently comparative task and requires consideration of the full range of an organization's activities. The Commission is not charged with deciding whether the election or defeat of a candidate is *one of* an organization's major purposes. Isolating one or two factors would, by the very nature of the inquiry, make it impossible to determine whether the organization, as a whole, operated with *the* major purpose of electing or defeating a candidate. As the district court explained in *Shays v. Federal Election Commission*,

> an organization . . . may engage in many non-electoral activities so that determining its major purpose requires a very close examination of various activities. Or an organization may be engaging in substantial amounts of both federal and non-federal electoral activity, again requiring a detailed analysis of its various activities.

511 F.Supp.2d 19, 31 (D.D.C. 2007). Therefore, the FEC is entitled to consider the full range of an organization's activities in deciding whether it is a political committee.

RTAO has not persuaded the Court that the FEC's approach substantially harms an organization's ability to speak. RTAO thinks *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986), only permits the Commission to use two factors in determining whether an organization is a political committee: the organization's expenditures and the central purpose revealed in its organic documents. That argument is incorrect. In that case, the Supreme Court implied that a group's central organizational purpose and the amount it spent in independent expenditures were relevant factors in determining whether an organization was a political committee. *Id.* at 252 n.6, 262. *Massachusetts Citizens for Life* did not hold, or

22

even suggest, that those factors are the exclusive indicia of an organization's status as a political committee.

Since *Massachusetts Citizens for Life*, courts have endorsed the consideration of an organization's public statements, spending and contributions, and non-public statements in determining whether an organization is a political committee. *See Fed. Election Comm'n v. Malenick*, 310 F.Supp.2d 230, 234-37 (D.D.C. 2004); *Fed. Election Comm'n v. GOPAC, Inc.*, 917 F.Supp. 851, 859, 864-66 (D.D.C. 1996). Additionally, the Fourth Circuit previously agreed with this Court's judgment that the Commission's political committee status policy is likely constitutional. *Real Truth About Obama*, 575 F.3d at 351. As the panel explained, the policy "appears simply to be adopted from Supreme Court jurisprudence that takes a fact-intensive approach to determining the major purpose of a particular organization's contributions." *Id.* The use of multiple factors to implement disclosure requirements does not greatly burden an organization's speech, because "disclosure requirements impose no ceiling on campaign-related activities." *Buckley*, 424 U.S. at 64. By relying heavily on relevant Supreme Court and lower court cases, the FEC's policy determines whether an organization as a whole aims to elect or defeat a particular candidate. Therefore, the FEC's political committee status policy ensures a correlation between the Commission's interest in providing voters information and the information required disclosed by political committee status.

*Citizens United* did not alter the Court's analysis. *Citizens United*'s primary holding, in which the Supreme Court held § 441b unconstitutional, does not shed light on the constitutionality of the political committee status policy. The Court did consider the constitutionality of certain disclosure requirements, but only those applicable when an organization makes an electioneering communication. 130 S.Ct. at 914-15. *See* 2 U.S.C.

23

§ 434(f)(3)(A). The Court applied exacting scrutiny to those disclosure requirements and upheld them. 130 S.Ct. at 915-16. After *Citizens United*, the D.C. Circuit has further explained that the additional burdens imposed by political committee status are "minimal" when compared to the burdens on other persons who make independent expenditures. *SpeechNow.org*, 599 F.3d at 697. To the extent *Citizens United* speaks to RTAO's claim, it confirms the Court's judgment that the FEC policy is subject to a more relaxed level of review than RTAO believes it is.

The Supreme Court did not consider any issue related to an organization's eligibility as a political committee or the burdens an organization suffers as a result of being so categorized. Nor does the Supreme Court's criticism of 11 C.F.R. § 114.15 lead to the conclusion that any multi-factor test implementing a campaign finance regulation is unconstitutional. RTAO thinks that it does, but the Court disagrees with that argument for reasons similar to those it cited in rejecting the argument with respect to § 100.22(b).

RTAO has not convinced the Court that the FEC's political committee status policy is unconstitutional as applied to it. There is evidence before the Court suggesting that, prior to the 2008 election, RTAO's major purpose was the defeat of Senator Obama as a presidential candidate. *See Buckley*, 424 U.S. at 79. RTAO's articles of incorporation list among its primary aims the dissemination of information about Senator Obama's policy positions. As the Court has explained, the two advertisements before the Court are express advocacy communications aimed at dissuading citizens from voting for Senator Obama. RTAO's fundraising communication says RTAO plans to persuade the public about the "real truth" about Obama's position on abortion. It further states that "everyone would support" a certain abortion restriction proposed in Illinois and describes Obama's opposition to the measure "radical." RTAO argues that it merely plans to engage in issue advocacy, but the materials before the Court disclose a singular focus on Senator

24

Obama suggesting a major purpose to defeat his presidential candidacy.  Given these indications that RTAO's major purpose is Senator Obama's defeat, the Court does not conclude the FEC's political committee status policy is unconstitutional as applied to RTAO.


V.  Conclusion

For the reasons stated above, the Court grants summary judgment in favor of the FEC and the DOJ, and rejects RTAO's challenges to 11 C.F.R. § 100.22(b) and the Commission's policy on determining political committee status.

Let the Court send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order will issue.

```
                    _____/s/_____
                    James R. Spencer
                    Chief United States District Judge
```

ENTERED this _16_ day of June 2010